## FRYE v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY, Appellant.

### Division One, December 22, 1906.

1. **APPELLATE PRACTICE: Demurrer to Evidence: Waiver.** Where defendant does not stand on its demurrer to the evidence offered at the close of plaintiff's case, but puts in its own evidence, and then at the close of the case offers a demurrer, it waives the first demurrer, and on its appeal the correctness of the court's ruling on the last demurrer is the open question, and that depends on all the evidence.

2. **EXPERT TESTIMONY: Concrete Case: Negligence: Seeing Traveler On Track.** Expert testimony as to the distance a person could generally see a traveler on the track in front of him, has no place in any case. The evidence should be confined to a concrete case. In this case the concrete case would be: how far in advance would an electric headlight, such as is ordinarily used by prudent persons on engines, disclose to the engineer the

presence of a man on the track, taking into consideration the cloudy and surly night, the freezing weather and an engine plowing into a driving and somewhat blinding storm of snow, rain and sleet?

3. ———: ———: ———: ———: **Stopping Train.** So should the case be concrete as to the distance in which the train could be stopped, not the distance in which it could generally be stopped, but, in this case, the distance in which a passenger train of like length, going against a like storm of rain, snow, sleet and ice, on a slight up-grade, could be stopped with safety to the train and its occupants.

4. **NEGLIGENCE: Injuries: Sympathy: How far Controlling?** The injuries to plaintiff and the distressful consequences attendant thereon, call for sympathy and elicit attention, but they do not determine his right to recover damages; that right is to be found in reason, and in the determination of who was to blame for the injuries.

5. ———: **Accident: Res Ipsa Loquitur.** No liability can be predicated upon the happening of an accident, unless it be an accident of such a character that the thing speaks for itself.

6. ———: **Railroad: Right to Track.** A railroad company, whose track and right of way between country villages are enclosed by side fences, wing-fences and cattle-guards, is presumably there entitled to a clear track; and when sued for damages by a traveler walking on the track for injuries caused by a train, he is by statute deemed to have committed a trespass.

7. ———: ———: ———: **Trespass: Contributory Negligence.** The trespass of a traveler on a railroad track on which, because it is properly inclosed, defendant's trains are presumably entitled to a clear track, is to be considered negligence *per se*, and will defeat a recovery in a case where contributory negligence would defeat it.

8. ———: ———: ———: **Waiver.** A railroad company may waive its right to a clear track, by its knowledge of the free, open and continuous use thereof by the public, and its acquiescence therein. In such case it has no right to expect a clear track for its trains, but owes to traveling footmen thereon the duty to use ordinary care to look out for them and to avoid injuring them.

9. ———: ———: ———: ———: **Day Time and Night Time Use: Knowledge and Acquiescence.** A day time use of a railroad track by the public generally does not establish a night time use. And a night time use is not established by showing that eight or ten mill men, when the days were short, used the track

after dark and before day, in going from their homes in one town to the mill in another, a mile or more away, and by the occasional use by men living in the one, who went by night time to the other to visit a saloon, there being nothing in the showing to bring home notice to the company's employees of such use; and there can be no acquiescence without knowledge.

10. ——: ——: ——: **No Waiver.** It is held, under the circumstances of this case, where plaintiff, while walking in the night time, in a blinding storm, between country villages, on a railroad track properly fenced and posted against trespassers, was struck by an expected passenger train, no notice to the company of such continued use by footmen at night as would constitute a waiver having been shown, that defendant was entitled to expect a clear track; and, hence, owed plaintiff no duty to look out for him, and therefore, in order to recover, plaintiff must show that he was actually seen by the engineer in time to have warned him and thus avoid the injury. And no such showing was made.

11. ——: **Seeing Man on Track: Evidence: Res Gestae.** Testimony that a person, supposed to be the engineer of the train which struck plaintiff, at the next town where the train stopped, stated that he "knocked a hobo off the track down the road," is no part of the *res gestae*, and is inadmissible in chief to fasten liability on the company. But if unobjected to, it is lodged in the case for what it is worth; and for the reasons set forth in the next note, it was worthless.

12. ——: ——: **Burden on Plaintiff: Presumptions.** Plaintiff cannot be relieved of the burden of showing negligence. It cannot be presumed, in the absence of evidence, that the headlight disclosed to the engineer the presence of plaintiff on the track at the time of a blinding storm, or that vision from the cab windows was not obscured by the freezing wind and rain; nor did the engineer owe a duty to a trespasser to thrust his head out of the windows in the face of the storm.

13. ——: ——: **No Headlight: Trespasser.** A trespasser on the track cannot complain of the absence of a headlight from the engine, between crossings in the country.

14. ——: **Use of Track: Custom: Pleading.** The allegation of the petition in reference to the use of the track by pedestrains was in these short words: "he was, with permission of defendant, by long use and custom, walking on," etc. *Held*, insufficient to charge a public use and custom, but the case having been tried below on the theory that the permission to plaintiff arose from the fact of a long public use of the track, this insufficient allegation is not fatal on appeal.

Appeal from Wayne Circuit Court.—*Hon. Frank R. Dearing,* Judge.

REVERSED.

*Martin L. Clardy* and *James F. Green* for appellant.

Upon the uncontradicted evidence plaintiff was not entitled to recover, and defendant's instruction so declaring should have been given. Sinclair v. Railroad, 133 Mo. 233; Rine v. Railroad, 88 Mo. 392; Carr v. Railroad, 92 S. W. 877; Barker v. Railroad, 98 Mo. 50; Carrier v. Railroad, 175 Mo. 470; ·Hyde v. Railroad, 110 Mo. 272; Jackson v. Railroad, 157 Mo. 621; Kries v. Railroad, 148 Mo. 330.

*V. V. Ing, Almon Ing* and *M. R. Smith* for respondent.

(1) The trial court did not commit error in refusing to give the two instructions asked by appellant in the nature of demurrers to the evidence. Dalton v. Poplar Bluff, 173 Mo. 79; Farrell v. Railroad, 103 Mo. App. 454; Scheutte v. Railroad, 108 Mo. App. 653; Herndon v. Lewis, 175 Mo. 116; Graham v. Railroad, 113 Mo. 408; Wood v. Railroad, 95 S. W. 946; Eppstein v. Railroad, 94 S. W. 967. (2) Plaintiff was not a trespasser while walking on the railroad track at the time and place when and where struck and injured by defendant's engine. Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 208; Scullin v. Railroad, 184 Mo. 705; Murrell v. Railroad, 105 Mo. App. 88; Hutchinson v. Railroad, 88 Mo. App. 376; Spencer v. Railroad, 90 Mo. App. 91; Andrew v. Railroad, 88 Mo.ᐟ App. 97; Dieter v. Zbaren, 81 Mo. App. 612; O'Kief v. Railroad, 81 Mo. App. 386; Green v. Railroad, 192 Mo. 132; Payne v. Railroad, 105 Mo. App. 155; Ren-

dick v. Hammond Pack. Co., 106 Mo. App. 717; Epp-
stein v. Railroad, 94 S. W. 967.

LAMM, J.—George H. Frye sued defendant rail-
way company in the circuit court of Wayne county for
$20,000 damages for personal injuries.  A jury award-
ed him $5,000, and, from a judgment entered on that
verdict, defendant appeals.

At the close of plaintiff's evidence in chief, and
again at the end of the case, defendant demurred, and
its demurrer in each instance being disallowed, it saved
exceptions.

As defendant did not stand on its demurrer at the
close of plaintiff's case, but produced its own evidence,
it must be held to have waived the first demurrer, and
the open question on this behalf is on the court's dis-
position of the last demurrer—the correctness of that
ruling depending upon all the evidence.

Attending to the facts, on the part of plaintiff it
was shown that he was thirty-five years old and, with
his wife and two children, lived at Mill Springs, a lit-
tle hamlet of two or three hundred people on the line
of defendant's road in Wayne county.  Say a mile and
a quarter north of Mill Springs was another way-sta-
tion, Leeper.  Leeper was a village of four or five hun-
dred souls and there seems to have been a rather exten-
sive sawmill there, using hands in the mill and mill
yards.  At the time in hand, some eight or ten of these
employees lived at Mill Springs, among them, plaintiff.
Plaintiff had been employed a year or so as a roust-
about in such yards.  Defendant's road between said
stations is a straight line, and the grade is a slight up-
grade to the north.  Parallel with this portion of de-
fendant's track and adjacent to defendant's right of
way is a public dirt road, also connecting Leeper and
Mill Springs.

The wind before daylight on the morning of Feb-
ruary 16, 1903, was blowing a gale from the north and

the weather was freezing cold—the petition alleging it was "very cold." From the description of the weather and the hour given by witnesses, we infer the night was uncommonly morose and bitter—the darkness being such as indicated by the proverb: The darkest hour is that before dawn; and being deepened in this instance by heavy clouds. Moreover, there was a snow storm raging, accompanied by rain—the snow and rain being driven with vehemence to the south by a north wind. Plaintiff's description of the night just before day is as follows: "The snow was falling and the wind was blowing; it was snow and rain mixed together and there was some snow on the ground. It was very cold weather, as we generally have here." At another place plaintiff testified it was "slick" and again was inquired of by his counsel as follows: "Q. You say it was snowing very heavy that morning?" To that inquiry he answered, "Tolerably heavy. Q. Wasn't it a very thick cloud? A. Yes, sir." At another place he says: "There was some snow and a mist of rain." A witness for plaintiff described the weather as follows: "Q. What kind of a morning was that? A. It was about as bad a morning as a person hardly ever sees. Q. Was it snowing? A. Yes, sir. Q. From what direction. A. From the north." Another witness, Captain Leeper, who impresses us as a very fair witness, testified the fury of the storm had not abated at 7 a. m.; that the snow was falling very fast that morning and the wind was blowing. He lived on the public road, before referred to, and about a half mile from Leeper. He took the railroad track at his home that morning at seven o'clock to go to the latter town and says he passed within thirty yards of where Mr. Frye must have been, and looked down that way, that is, to the south. He saw a man standing on the track, that is, could see his form but couldn't form any idea of who it was and we take it his inability to recognize that man (who seems

to have been an acquaintance of his) and his failure to discover plaintiff was because of the blinding fury of the storm.

Plaintiff left his home that morning at about 5:30 a. m., dressed in two coats, crossed the public road aforesaid and, as usual, took defendant's main line track for Leeper, on foot, to be on hand at 6 a. m. at the opening of the mill for work. When he entered on defendant's track, he looked and listened for an approaching train. Seeing and hearing none, he faced to the north, crossed the cattleguard at the crossing there, and, breasting the storm, traveled between the rails for a quarter of a mile and then stopped and again looked and listened for a train. Still seeing and hearing none, he resumed his journey, neither stopping, listening nor turning his face again to look behind him, and, when about one-half of a mile from the crossing at Mill Springs and three-quarters of a mile of Leeper, he became conscious a train was coming on him from the rear. He heard no whistle or bell but heard what he described as a "humming noise," a "very small noise," a "little shake of the ground," and, so hearing, turned his head and found a locomotive engine on him. From that time on, he knew not a whit more, except that he was hit and thinks he was hit in the back. When daylight came he was found at about 7 o'clock hanging on the fence of the right-of-way, that is, standing and leaning over the right-of-way fence, unconscious, one of his legs broken just above the ankle, his back bruised, his face wounded and disfigured, his hands frozen, and, as we understand it, his fractured leg frozen.

As the result of his injuries, one of his legs is shorter than the other and his hands are mutilated by the amputation of at least some of his fingers. The first glimpse of consciousness he had was his overhearing a talk by his father-in-law about sending him to the Mullanphy hospital at St. Louis. This was about

a week after he was hurt. As no question is raised over the extent of his injuries or the amount of damages recovered below, this part of the case need not be further pursued or developed.

It seems defendant's through passenger trains from the south did not stop at Leeper or Mill Springs, but did stop at Piedmont, a station a few miles north of Leeper. It seems there were two or three of these trains, grouped on the time schedule pretty close together, and, when on schedule time, passing Mill Springs in the small hours of the night, say, from one to two o'clock. Coming from afar, they were usually late at that inclement and treacherous season of the year. On the morning in question, the last of these trains was about three hours late and was the one running plaintiff down. It seems plaintiff thought the night passenger trains had passed up north before he took the track, and he did not remember of ever meeting a passenger train at that time in the morning; but he was conscious at the time of the fact that he was likely to meet a train—witness his testimony: "Q. You knew the train would come along in a few minutes? A. Yes, sir; I knew there was trains coming along there at all times. . . . Q. Didn't you know that trains were liable to come along that way any minute? A. Yes, sir. Q. You say that is right then? A. Yes, sir."

Plaintiff was the only eye-witness testifying to the fact of his being struck by the locomotive of a north-bound passenger train. So far as defendant's trainmen were concerned, they testified none of them saw him and none of them knew of the accident at the time and none of them heard of it until notified a fortnight or so afterwards. The testimony of the engineer and fireman, just referred to, must be considered here with an eye to any modification due to, or arising from, the testimony of two of plaintiff's witnesses. One of

these witnesses was Ross.  Plaintiff was hurt of a Monday morning, and Ross, who was then a section hand and now is a.farm hand, had been to Poplar Bluff the Sunday before, a town, 30 or 40 miles south of Mill Springs, and did not go to bed Sunday night.  On being inquired of what he was doing in Poplar Bluff, he answered: "I went there *browsing* around."  He further said, "I found right smart browsing."  We infer his "browsing" was drawn out to cover Sunday and Sunday night, and until he took the train that collided with plaintiff.  He rode on this train to Piedmont, and the following questions were propounded to him and answers given, without objection on the part of defendant, relating to what happened at Piedmont:

"Q.  Did you hear any railroad man, either a fireman or engineer, that got off of that train on which you went to Piedmont, make any remark as to what happened down the road?  A.  I seen a man get off of the engine that had stopped and I went into the depot and he went into the depot and I heard him say to the man through the hole in the depot office, 'I knocked a hobo off south of Leeper as I come up.'

Q.  Did he say anything else?  A.  I don't know, but I believe he says, 'I killed him or put him in the clear.'

Q.  Where did you hear that?  A. In the depot at Piedmont.

Q. Did he say anything about dumping a man?  A. He said, 'He put him in the clear down the dump.'"

Having allowed the foregoing evidence without objection, Ross was cross-examined, and in his cross-examination said he did not know the engineer and he did not know the fireman.  He said the man who made the remark registered on a book at the depot and was one or the other.  He further said he didn't know the man to whom the remark was made, but he saw the man who made the remark "register."

By another witness, Cook, who worked about in the mills in that neighborhood, as he said, "off and on and not very long at a time," it was shown that he was on the train with Ross; and without objection the following inquiries were propounded to him and answers given, relating to Piedmont:

Q. Did you hear anything said about that train having knocked some one off the track? A. Yes, sir.

Q. What did you hear them say? A. I heard them say they knocked a hobo off the track.

Q. Where. A. This side of Mill Springs.

Q. Where was the man when he said that? A. In the depot.

Q. Did you know him? A. No, sir.

Q. Do you know where he came from? A. Off the train, I suppose.

Q. Did you see him come off the train? A. No, sir.

Q. Who was with you? A. James Ross.

Q. Where was the man when he said that? A. He was right there at the depot looking through that window.

Q. What was he doing? A. I didn't pay any attention to what he was doing.

Q. What kind of clothes did he have on? A. I didn't pay any attention to his clothes.

Q. Do you know whether he was a trainman? A. I think so.

Q. What makes you think so. A. I thought he was the way he talked.

Q. You say he said something about knocking a hobo off the track? A. He said he knocked a hobo off the track.

Q. Anything else? A. A man said: "Did you kill him?" and he says he rolled down the ditch.

Q. Do you know who it was asked him the question? A. No, sir.

Q. You was present when he asked the question?
A. Yes, sir.

Q. Who was on the other side of that window?
A. He was in the same room I was. Ross and I went in there to warm.

On cross-examination Cook testified he didn't know where the man who made the remark came from, that he looked like a railroad man, that he had on "greasy clothes," that he made the remark "to the fellow that was with him, I guess." He further testified he thought the man who made the remark came from the engine and that the man he spoke to came off the train and he thought belonged to the engine, but he didn't know the engineer.

When defendant came to putting in its case, it introduced its engineer and fireman and showed by them that no such conversation occurred. They both testified that neither of them left the engine or went into the depot at Piedmont. They further testified that between Mill Springs and Leeper they were at their posts of duty on the engine, looking out ahead, and say they saw no one on the track between Mill Springs and Leeper. Being in court, no attempt was made to identify them as the identical persons who had held the conversation above related by Ross and Cook. It was further shown and remained uncontradicted that firemen do not register at all, that defendant's engineers do not register at Piedmont, and that the conductors alone go to the depot for orders, they wearing uniforms.

The case proceeds on the theory on both sides that the train, being behind time, was running very fast to make up time, say, from 35 to 50 miles an hour—the track being straight and in good fix between Leeper and Mill Springs. There was some evidence from plaintiff and his witnesses to the effect that there was no headlight on the engine. One of his witnesses

(Ross) noticed it had no headlight at daybreak at Piedmont. Two boys named Webb were behind plaintiff over a quarter of a mile and they testify they noticed there was no headlight when the train passed them. They say, however, that the cars were lit up and lights from the car windows showed plainly on either side of the train. One of these boys, Oscar, testified as follows: "Q. How far behind you was this train when you first saw it? A. Three hundred yards. Q. You could see it plain? A. I could see a light out of the windows. Q. Couldn't you see the train? A. I could see the bulk of it."

There was strong evidence on behalf of defendant to the effect that the engine was equipped with an electric headlight burning all the way from Poplar Bluff to Piedmont. So, too, as we gather, there was no contradication of defendant's proof that engines had been changed at Poplar Bluff an hour or so before, and a fresh one coupled to the train there, with its headlight in perfect going order. It seems, also (from causes unexplained), that electric headlights sink down to a mere glow now and then, only to flash forth after each fit of depression into brilliancy again. It seems, further (from reasons unexplained), that sometimes carbons unexpectedly and prematurely burn out or are defective and headlights go out in consequence. If, however, the headlight of this engine misbehaved that way, at the place and time in judgment, the fireman and engineer say, in effect, they were not aware of it; and, aside from an inference to be drawn from the the mere fact that such headlight was out at daybreak at Piedmont, was out when it passed the Webb boys, and that the hasty glance of plaintiff at the instant he was struck revealed no headlight to him, there was no evidence forthcoming that said engineer and fireman were aware of its being out. One of the Webb boys

testified the rumble of the train was heard by him for a quarter of a mile as it came up from the south.

A mass of expert testimony was introduced on different hypothesis. For example, contradictory evidence was introduced as to the distance in which a train could be stopped that was going at this, that or the other rate; and, further, contradictory evidence was introduced as to the distance in front of the engine a man would be on the track when he first became visible from the rays of light an electric headlight throws ahead. The details of this evidence we consider unimportant, and the evidence itself without force. And this is so because there is no question in the case calling for evidence (generally) on what distance a train could be stopped; and (generally) on how far in advance of an engine a man could be discovered in the night time on a track by the aid of a headlight. The only issue lodged in this case in the last regard (if any at all under the facts here) was, taking into consideration the dirty and surly night, the freezing weather, an engine plowing into the teeth of a driving and somewhat blinding storm of snow, rain, and (probably) sleet—we say, taking these pertinent and present conditions into consideration, then how far in advance would an electric headlight, such as ordinarily used by prudent persons on engines, disclose to the *engineer* the presence of a man on the track? We find no evidence worthy of the name directed to that fact. The same observations may be directed to the expert evidence pertaining to the stopping of the train. The ability to stop a train generally, that is, the distance in which it could be stopped, was wholly in the air. The concrete case, even if such question be pertinent at all, was in what distance a passenger train of the length of the one doing the injury, going against such a storm of snow, rain and wind as then prevailed, could be stopped with safety to the train and its occupants,

on a slight up-grade, equipped with the appliances that train had, on a track affected by snow and rain, and (more than likely) ice; because it was freezing weather and we may take judicial notice of the law of nature pertaining to the effect of frost on rain. We find no testimony even remotely bearing upon that precise question.

There was evidence on one side that no crossing signal was given for Mill Springs, and evidence to the contrary on the other. As said, plaintiff before being struck heard no signal, and the two boys following him that morning, and over a quarter of a mile to his rear, testified no signals were given. On this score defendant's said employees deny seeing plaintiff in jeopardy, and, of course, they had no occasion (on their theory) to give any signals at the place of the accident and gave none.

Plaintiff's case was put to the jury and it is put to us here on the theory the track between Mill Springs and Leeper was fenced, that the place of the accident was in the country where the road ran through farming land, and yet, that it was a place where defendant had no right to expect a clear track, even in the night time, and therefore owed a duty to persons on the track to look out for them, to see them in danger and to exercise ordinary care to prevent injuring them. Plaintiff says defendant neglected that duty. To bring the case within the foregoing theory, plaintiff introduced a mass of testimony relating to the use of the track by pedestrians, the substance of which is as follows:

Plaintiff's testimony was to the effect he got on the track at Mill Springs that morning, the same as he had been doing for over a year, and further: "there was a heap of people going and coming both ways, night and at all times during the day;" that he had never been forbidden by anybody or told not to use that track; nor had he heard of anybody else being forbidden to use it.

He said, too, that many people used the track in going back and forth between the towns of Mill Springs and Leeper. On cross-examination, he was asked · if he could read, and he replied, "a little bit." He said he never read any notice stuck up to keep people off the company's right of way and track; never saw such notice; never saw any signboards forbidding people to go on the right of way, or making them trespassers; said he wasn't looking for signs; said he knew it was dangerous to walk on the railroad, but "I had to walk on the railroad to get to my work;" said there was a branch across the public road, running out of the horse lot of Captain Leeper (Leeper lived along the public road between Mill Springs and the town of Leeper), that had water in it in rainy weather, and he walked on the railroad to keep from wading that branch.

Doctor Owens testified for plaintiff that he lived at Mill Springs about sixteen years; that people passed back and forth between the two towns frequently; that they traveled both the dirt road and the railroad—the railroad more extensively than the dirt road; that this had been so during the time he had lived there. "Q. Is that during both night and day? A. Yes, sir; there is more travel at night than by day. . . . Q. There are a great many people living at Mill Springs that work at Leeper, are there not? A. Yes, sir. Q. How many? A. I don't know exactly; some few. Q. Twenty-five or thirty? A. No, sir; some eight or ten, possibly. Q. Was it the custom for the people living at Mill Springs to come down to the saloon" (at Leeper) "after night to drink? A. Yes, sir; I think so." He further testified that he had never heard of any "objection to this." There was evidence from this witness that there was a saloon at Mill Springs, as well as at Leeper. On cross-examination, Dr. Owens testified he knew notices were stuck up forbidding trespassing on

the tracks and right of way. Witness here identified a notice that had been posted at Mill Springs. The notice was plain for everybody to see. Said notice (read in evidence by defendant's counsel) was to the effect that persons not having business with the company's agents or employees were positively forbidden to enter, sit, stand or walk upon the tracks, right of way, etc., are forbidden to enter on the company's property to transact their private business; are notified that they have no legal right to disregard this notice; and that in every such case they are trespassers, etc. This notice was signed by the general superintendent of defendant company. Doctor Owens further said that most everybody traveling from Mill Springs to Leeper who walked on the railroad did so because it was a better walk. Witness knew when he was so walking that it was against the express rules of the company; knew that he was in danger of being struck by a train; intended to take his own risk and step out of the way if a train did come. Witness knew about the branch spoken of by plaintiff in his testimony; said it was a dry branch; that sometimes in wet weather it interfered with traveling, but that "Capt. Leeper generally keeps a plank across it," always kept a plank there "except in case of high water, when it is washed away." On re-examination witness spoke of a place on the dirt road called the "narrows," and said that through the "narrows" it was generally bad walking, that the best way was to go on the railroad track, that sometimes people would go down the dirt road to the "narrows," and then get over on the track; that was the way a good many people went.

Captain Leeper testified for plaintiff that footmen have been using that portion of the track ever since the road was built; that the people of the two towns used it; that when the dirt road was muddy nearly all the foot-traveling between the two towns is by the railroad,

and that when the dirt road was dry a good many of
the people going from Mill Springs to Leeper get off
the dirt road at the "narrows" and cross over the rail-
road fence and from there on travel up the track. Wit-
ness said he never paid any particular attention to the
number, but it was very seldom you couldn't see some-
one. He did not know about the night travel. He used
the railroad himself, crawling over the right-of-way
fence at his place. He did this because the track was
dry. Witness estimated that the larger portion of the
people traveling between the two towns used the rail-
road and he thought this had been going on for about
ten years. Witness in his examination in chief, how-
ever, said that while he never had read the notices, yet
he supposed the railroad company had put up notices.
On cross-examination, the witness said he had seen such
notices, though he had never read them, yet he had an
idea what they were and that the company forbade the
use of its track. He always thought enough about it
to look out for himself, and "had an idea" that travel-
ing there was against the notices and instructions of
the company, and that when he traveled on the railroad
track he took his life in his own hands and looked out
for it. Witness said there had been several men killed
between these two places. Some of them were drunk,
and some of them not. Witness did not think that the
larger portion of the men going from Mill Springs to
Leeper went for the purpose of drinking at the Leeper
saloon. He thought the larger portion went back and
forth on business. He had seen as many as ten or
twelve leave Mill Springs to walk to Leeper.

The witness Ross, heretofore referred to, said on
cross-examination that he resided at Mill Springs and
that when he wanted to go to Leeper he walked the
railroad. Witness identified the notice against tres-
passing, heretofore in evidence, and said he had seen
it many times; that it was plain for everybody to see,

but he didn't believe he ever read it; that he never had any permission from anybody to walk down the track. On re-examination he said he hadn't walked the dirt road a dozen times in seventeen years, but had walked a part of the way, down to the "narrows;" that it was at the "narrows" where most of the people got on to the track, but some of the people got on at Mill Springs crossing. Witness had never heard of officers of the road informing footmen they ought not to walk on the railroad. Witness never saw any notice or warning against it on the part of the company, "except that big board set out there." People used the track for passing between the towns notwithstanding the warning. He said there was nothing to "prevent a railroad man from knowing that people passed up and down this track."

By Oscar Webb, plaintiff showed that he, Webb, a fifteen-year-old boy, worked at Leeper and lived at Mill Springs. Webb said he used the track in going and coming; that most of the people did the same. On cross-examination, witness testified he had seen the notice forbidding people to go on the right of way; that the notice was up at the time of the accident; that he had seen it many times. Witness knew he was going against the instructions and directions of the company in going on the railroad, and he went there expecting to take care of himself. He also testified that plaintiff was hurt south of the "narrows," that is, between the "narrows" and Mill Springs.

By James Webb, a brother of Oscar, plaintiff showed that he also lived at Mill Springs and had worked at Leeper for about two years and used the railroad track. Witness testified the railroad was fenced, and that he and the rest would get on it at Mill Springs, crossing over a cattle guard in order to do so. He also said that sometimes people going from Mill Springs up the dirt road got on the tracks at the "narrows,"

saw the sign of people getting on there, that is, a pathway. Witness said that no one representing the railroad company ever objected to his walking on the track and he had frequently met section men. The travel was by day and by night. Witness never heard of any rule against walking on the track; never heard of any statute law against it; had been walking there for two years. On cross-examination, witness said he could read print, admitted he had seen a sign put up to keep people off the right of way, but said he had never read it. On being further pressed, he said he didn't know it was a sign to keep people out of danger, and said he didn't have any idea what it was and didn't know what it was there for, that he heard no one say; and didn't know whether his brother, Oscar, was older than he or not.

By William Radford, plaintiff showed in chief that he lived at Mill Springs and worked at Leeper. He said most of the people traveling between the two towns used the railroad, and he never heard of the railroad company making any objections to such use of the tracks. This witness also said people left the dirt road and got on to the railroad at the "narrows," and that the top wire was broken there, between posts, and had been broken a "right smart bit" and said there was a pathway there. On cross-examination, witness said he had seen the notice (against trespassing and using the tracks) introduced in evidence, and had read it and knew it prohibited the use of the right of way; didn't think much about violating the rules of the company; he knew it was the company's road and he guessed they didn't want anybody to go that way. He further testified he went on his "own hook" and intended to take care of himself; that he never saw any notices posted at Leeper against trespassing, but the one at Mill Springs was out where the public could see it. On re-cross-examination, witness admitted seeing a sign

also at the crossing at Mill Springs warning people, but he couldn't say whether it was there at the time of the accident or not.

By Mr. Green, plaintiff showed that he, Green, lived at Leeper; had lived there a year and eight months; had seen one danger signal (notice?) at Leeper; thought it was knocked down with a coal oil can in 1902; hadn't noticed one since. This witness, who was nineteen years old, said he traveled several times between Mill Springs and Leeper; that other people used that track "a great deal;" couldn't say how many, but "a good many." And finally the witness hazarded his opinion that "a big portion of Leeper, something like 150 people" used it "every day." On cross-examination, witness said he never had seen any notice except the one in the yard at Leeper notifying people to keep off the track. He also said that when he traveled on the track he understood he was traveling there against the rules and notices of the company, and understood he went on the track against the objections of the company, and said he went there expecting to take care of himself and get out of the way of a train.

By Mr. Holliday, plaintiff showed that he lived at Leeper one year and at Mill Springs two years; that he had walked from one town to the other, but not frequently; that people generally went by the railroad, that is, decidedly more than went on the dirt road. Witness had seen men go both ways. On cross-examination, witness said he had seen notices at Mill Springs for the people to keep off the track and he understood when he went on the track he was going there against the desire and will of the railroad company. Witness said he didn't go on the track believing he had the company's consent, but went there because he thought it was better walking.

By Mr. Huter, defendant showed that he, Huter,

was section foreman at Mill Springs. Witness identified the notice and warning heretofore introduced in evidence and said it was at the depot door. He also testified there was another notice at, or about, the crossing at Mill Springs; had seen the same kind of a notice at Leeper before and after that; that sometimes people tore them down, and, as we understand it, they were put back again.

By Mr. Allison, its station agent at Leeper, defendant showed there was a notice at Mill Springs at the station, and also one at the crossing there of the character heretofore indicated, and also one at Leeper. There was another warning notice there, having the same end in view, a square board stuck up on the station platform. This was found down once, but the section men put it up again. It was torn down again and again replaced. It was the duty of the section men to keep it up.

The foregoing is the evidence pertaining to the use of the track by the public and the efforts of defendant company to prevent that use.

The case was tried on an amended petition and the only allegation made relating to the use of the railroad track as a pathway between Mill Springs and Leeper was the following: "For his cause of action, plaintiff states that on the 16th day of February, 1903, he was, *with the permission of defendant, by long use and custom,* walking on the railroad track of defendant, between the towns of Mill Springs and Leeper."

The negligence complained of was that defendant's train was run "negligently, carelessly and recklessly . . . at a very high rate of speed and failed to sound the whistle or ring the bell or to have any headlight on said engine or to do anything to warn plaintiff of its approach; that plaintiff did not know of the approach of said engine and train in time to avoid his being hit by it, because of said negligence . . .

in failing to sound the whistle, ring the bell or have a headlight on said engine; . . . that said agents, servants and employees of defendant knew or, by the exercise of ordinary care and caution, could have known, of the danger in which plaintiff was, in time to have prevented plaintiff from being injured by said engine and train.''

There is also a complaint made of negligence in leaving plaintiff, wounded and unconscious, to freeze by the side of the track, in winter weather, but the details of this complaint we deem unimportant, since that specification of negligence was not put to the jury.

The answer admitted defendant's incorporation, denied every other allegation in the petition and pleaded plaintiff's contributory negligence.

The replication put in issue the new matter in the answer.

On issues thus outlined and on such evidence, had plaintiff any case on the law? This question is the major one and lies at the threshold of the investigation. If answered, yea, then we must address ourselves to other errors assigned. If answered, nay, other assignments of error become moot questions, not calling for judicial consideration in this case.

The disfigurement and injury of plaintiff bespeak sympathy, but they (considered alone) do not disturb the scales of justice, but leave them in exact equilibrium. No liability can be predicated upon the mere happening of an accident, unless it be an accident of such character that the thing speaks for itself, *i. e.,* one controlled by the maxim, *res ipsa loquitur*—in nowise applicable here. Sympathy is an element in the administration of justice, but a subordinate one. Sympathy may incline the ear of justice to hear; it may soften the sensibilities and elicit the attention of justice; but the reason of the judge, and that alone, must sit in judgment. When plaintiff put himself on a railroad

track on which trains run, if he remained there long enough in the nighttime, his death or hurt was inevitable. In so far as it was inevitable, reason ought not to concern herself with the distribution of praise or blame. Turning our eyes, then, from the mere injuries plaintiff suffered and the mere dramatic incidents of time and circumstance disclosed by the evidence, we must seek for actionable blame, if any, elsewhere—the controlling question not being, was plaintiff injured, but being, who was to blame for the injury? Was it plaintiff, or was it defendant?

I. In the first place we may start with the fundamental proposition that defendant was presumably entitled to a clear track between Mill Springs and Leeper. The law allows that presumption. Its track and right of way there were segregated and inclosed by side fences, by wing-fences and cattle-guards. That is to say, there were present the usual *indicia* of a private enclosure. Not only so, but the statute forbids any person (not an employee) to walk upon any such railroad track, and requires that in all suits brought for damages by persons harmed on account of walking on such track, they, in the act of so walking, "shall be deemed to have committed a trespass." [R. S. 1899, sec. 1105.]

The working theory the courts have adopted to give effect to the section just referred to is that such acts are considered negligence *per se* and will defeat recovery in a case where contributory negligence would defeat it. [Morgan v. Railroad, 159 Mo. l. c. 276.]

Not only does the written law lie with that view, but such view is fortified by the reason of the thing. Thus, the right of way is acquired by purchase or compensated for in damages under the watchful eye of courts and the stringent application of constitutional and statutory safeguards, and the easement of railway companies in their tracks and rights of way, from the

very necessity of the thing, is deemed in the first instance a paramount and exclusive one. For instance, trains run at great speed, both by day and by night. . The property of shippers, the life and limbs of passengers and trainmen are all fettered to and bound up with the proposition that trains should have a clear track in the country and between crossings. If we gave way to any other view, we would open a flood-gate for manifold wrongs, to the traveling public and public service corporations, to enter, and there would be "fine" grinding in the mill when the waters of that flood came in. If A and B at their own, and against defendant's will, may appropriate defendant's track for their private walking, then, by that token, they may also appropriate the track for the use of their horses, their asses, their sheep, and their swine and horned cattle. It ought not to be expected that we would so hold as to encourage a notion adding new dangers to the array now confronting trainmen and the traveling public, and thereby make a gazing-stock of the law.

II.   But while the general proposition laid down in paragraph one of this opinion is well enough as a general proposition, yet a railroad company may waive its right to a clear track, that is, it may know of and acquiesce in the use of portions of its track by the public.   And while such appropriation, use and acquiescence may each and all be wrongs to travelers, journeying by trains, to shippers and trainmen, yet, such appropriation, use and acquiescence may result in a situation requiring the application of a modified proposition of law.   This modification springs into existence when a situation arises wherein a railroad company may be entitled to a clear track, yet has no right to expect one.   In such a case, out of tenderness and regard for limb and life, it has been held that where the general public have been invited to use the track by the tacit consent and long acquiescence of a railroad com-

pany in permitting the open, known, free, continuous
and extensive use thereof by footmen, then it owes a
duty to such footmen to use ordinary care to look out
for them and ordinary care to protect them from being
run down and maimed or killed.    [Frick v. Railroad,
75 Mo. 595; Williams v. Railroad, 96 Mo. 275; Cham-
berlain v. Railroad, 133 Mo. 587; Morgan v. Railroad,
159 Mo. 262; Fearons v. Railroad, 180 Mo. 208; Fiedler
v. Railroad, 107 Mo. 645; Eppstein v. Railroad, 197 Mo.
720.]

III.   Did plaintiff bring himself within the doc-
trine of the rule announced in paragraph two of this
opinion?   That is, was the place he was struck a place
defendant was entitled to a clear track but had no
right to expect one?   To bring a case within that rule,
the use established in the public may be likened some-
what to that giving rise to a prescriptive right, i. e.,
the use must be a known use, and must be confined to
the limits proved.

In this case, if it be conceded, *arguendo,* the use
of the track was so open, so continuous and so pro-
nounced that knowledge of the daytime use would be
inferred, yet it must be apparent no such use was es-
tablished for the nighttime.   Plaintiff's learned at-
torneys sought to establish the night use, but their evi-
dence fell short of proving a case to go to the jury on
that issue.   The night use of this track by pedestrians
was confined to two classes; first, the class to which
plaintiff belonged, to-wit, the mill men living at Mill
Springs and working at Leeper, some eight or ten in
number; and the utmost the evidence tends to show is
that when the days were short and the nights long
these men used this track after dark to come and go,
as plaintiff did.   The other night class, as we construe
the evidence, were those thirsty denizens of Mill
Springs, who, having dry whistles and parched gullets,

wet them at the Leeper saloon, and who, like Tam O'Shanter, habitually lingered over the cup at a distance from home after dark in spite of the dangers besetting the road. Of this latter class, it may be said that one swallow does not make a summer nor will the law make a public use of a railroad track out of many swallows (or swallowers) of the character under review. Indeed, we may ask whether the dry whistles after sundown in Mill Springs were notoriously so many and so dry—the nocturnal thirst there of such Gargantuan proportions—and the quality of liquor at the Leeper saloon was notoriously so fetching and seductive, that defendant's engineers (busy with the serious affairs of life) must be held to know thereof as a fact of current local history and govern themselves accordingly? We think not. Such matters do not usually proclaim themselves like an army with banners, or cry aloud from the house tops. In the absence of proof, we will presume that defendant's section men were not on duty after dark, and the case is barren of testimony bringing home notice to the employees, agents and officers of defendant of such use of their track by night-brawlers and tipplers. Acquiescence, in the very nature of things, assumes a prior knowledge—the one cannot exist without the other.

IV. No cases give rise to more perplexity than cases of the character now under consideration. Men, in flippant and defiant disregard and in the teeth of the protest of railroad companies, take their lives in their hands and unconcernedly walk in the nighttime on the piked-up paths of railroad tracks and thus seek to avoid the inconvenience of travel on dirt roads in muddy weather—applying to railroad tracks the doctrine of the right to travel *extra viam* when the roads are founderous, and, when injured, seek the courts for relief.

In the Eppstein case the writer had occassion to

refer to that character of sporadic use, and this court approved the exclusion of such use as an element in that case.

It must be evident that railroad companies are, in a sense, defenseless against such misappropriation of their tracks by footmen. They fence the right of way, they protect the track by cattle-guards, and, in this instance, defendant kept up notices and signs warning the public and protesting against their use of its track. We are brought, then, face to face with this asking proposition: what more can a railroad company do, or should it be required to do, to protect itself against appropriation of its track by footmen, who are *sui juris*, than was done in the case at bar? Shall it employ armed guards? Shall it build fences that cannot be scaled, crawled through or broken down? Shall it plant spikes in its cattle-guards to the danger of its own employees? Or use pitfalls? Or what can it do? We confess our inability to answer.

In our opinion, in a country district, away from congested populations, under the facts of this record, defendant did all that could be fairly asked of it when it enclosed its right of way and posted and kept up the signs shown in evidence.

We come to this conclusion, notwithstanding it has been held, and properly held, that, after notices posted, a long and continued public disregard of such notices, to the knowledge of defendant's employees, may be held to waive the notice. Such was the case of Fearons v. Railroad, 180 Mo. *supra*. But the law of that case must be read in the light of the facts of that case. As we interpret the case, a street railroad track was in a public street, Eighth street, and ran to a place where Eighth street was not open, and continued in the line of the street into the mouth of a tunnel. This tunnel was 25 or 28 feet from bottom to top; and over the mouth, and, we infer, at the top, was a sign, "No

Admittance.'' The tunnel lay so that any one driving or walking along there might suppose it was a continuation of Eighth street. Watchmen had been employed at the entrance to keep people out, but such employment had been discontinued. The place was thickly settled and built up and the tunnel was used to connect two portions of a great city. It had a spring in it that people resorted to for water. Children and other people in ''great numbers'' walked through this tunnel daily, and the beaten paths there showed such long and constant use. As we understand it, the accident occurred in daylight. A man, one Newgent, was employed in this tunnel to sand the tracks and he had no instructions to keep people out. Mr. Fearons, an old man, wandered in there. He,was seen by a superintendent of the company, who ordered Newgent to get him out. While trying to get him out and while the old man was fast in a hole, he was run down by a street car and killed. The employees having charge of the car had space and time and light to see him, but did not see him and the question was whether it was their duty to see him. Fox, J., in disposing of that case and holding defendant liable, says this (p. 221): ''The only objection to the use of the tunnel was indicated by the sign, 'No Admittance.' This signal was not heeded, and if the number of pedestrians passed through the tunnel daily that the testimony tends to show, it is but a fair and reasonable inference that the motormen and conductor, operating defendant's cars continuously, knew that this signal, 'No Admittance,' was unheeded, and that the numerous people spoken of by the witnesses were using this tunnel as a passway.''

It will be seen the facts in the Fearons case differ materially from the facts in the case at bar. There notice was brought home to the very employees running the car doing the damage that the sign, No Admittance, was disregarded. The time, the place, the character of

public use, all differ from the case we are considering. In this case the trend of the evidence introduced by plaintiff from those using defendant's track between Mill Springs and Leeper was to the effect that these notices were not dead and abandoned; they were live notices; they were put up when torn down; and it is of significance that nearly all of plaintiff's witnesses understood there was life in the notices and death on the track—that they went on defendant's track against defendant's will, and expecting to lookout for themselves.

Space will not permit an analysis of the Morgan case, the Eppstein case or other cases relied upon by plaintiff, but examination shows they, too, differ in vital particulars from the facts we are considering.

We are pointed to no case going as far as plaintiff insists we should go in order to sustain this judgment; and, confining our conclusion on this branch of the case to the precise facts of the record, that conclusion is that at the place Mr. Frye was struck by defendant's engine, and at the time, to-wit, in the nighttime, it was a place and a time where defendant not only had the right, but it was entitled, to expect a clear track. Hence, it was a place defendant owed plaintiff no duty to look out for him; and, hence, in order to recover, plaintiff must show that he was actually seen by the engineer in time to have warned him and thus avoided his injury. [Rine v. Railroad, 88 Mo. 392; Barker v. Railroad, 98 Mo. 50; Sinclair v. Railroad, 133 Mo. 233; Reyburn v. Railroad, 187 Mo. 565.]

V. The case then narrows itself to this: was plaintiff seen by defendant's servants running the engine in time to warn him? There is no direct evidence this was so, but there is a mere glimmer of testimony inferentially tending to show they saw him. Thus, at another time, to-wit, afterwards, and at another place, to-wit, Piedmont, some man in "greasy clothes" was seen to leave the engine and go into the depot and "re-

gister." This man was believed to be the engineer and was overheard making an admission that he had "knocked a hobo off the track south of Leeper." This evidence, if objected to, was inadmissible in chief to fasten liability on defendant. It was no part of the *res gestae.* It was made subsequent to the event and no principle is more firmly settled than that an agent cannot bind his principal in that way. [McDermott v. Railroad, 73 Mo. 516; Adams v. Railroad, 74 Mo. 553; Bergeman v. Railroad, 104 Mo. 77.]

It must be remembered this evidence was not offered by way of impeachment to stain or destroy the credibility of the engineer and fireman. If the condition of the proof had warranted such impeachment, the rule would be otherwise. [Spohn v. Railroad, 122 Mo. 1.] But the testimony was unobjected to and may not be discarded on appeal, but is lodged in the case for what it is worth. [Kash v. Coleman, 145 Mo. l. c. 649; Farber v. Railroad, 139 Mo. l. c. 284; Carney v. Carney, 95 Mo. l. c. 358; Cady v. Coates, 101 Mo. App. l. c. 152].

There may be an inference that this man in "greasy clothes" was the engineer of the engine doing the injury, and, if so, the admission carries with it the inference that he saw plaintiff; but when he was seen and at what distance from the engine and under what circumstances may only be conjectured. May we relieve plaintiff of the burden of showing negligence? Certainly not. May we fall back upon some presumption that the headlight, if there, would disclose the presence of plaintiff at a sufficient distance in front of the engine to give time and space for his warning and escape? This might be so under ordinary conditions, but not in such a storm, where the record is silent on the condition of the cab windows from the freezing wind, the pelting rain and the snow; and silent on the effect on the headlight of such a storm. It must be re-

membered, too, that this engine was going at a great
speed, as it had the right to do, that the atmospheric
condition then prevailing would make eyesight uncer-
tain and probably the form of a man on the track a
flitting shade. We shall not hold the engineer owed
a duty to plaintiff, a trespasser, to thrust his head out
of the cab window and face such a storm, and, we hold
there is no testimony to support the theory Mr. Frye
was seen in time to warn him.

But plaintiff's attorneys argue there was no head-
light. It will be noticed that the absence of headlight
is pleaded in the petition as a negligent act toward
plaintiff. We need not inquire whether such act would
be negligent if injury came to passengers therefrom,
or if injury came to persons at crossings therefrom.
The question is whether plaintiff, a trespasser, can
complain of the absence of such headlight. The ans-
wer to this is self-evident. The headlight was not in-
tended for trespassers on the track. It was intended
for the safety of the trainmen, of passengers and of
those having a right to be on the track. The rule is that
a general duty of a railroad company to run its trains
with care becomes a particular duty to no one until he
is in a position to have a right to complain of the neg-
ligence. [Barker v. Railroad, 98 Mo. l. c. 54.]

And, furthermore, it will not escape attention that
there is no evidence of the *negligent* absence of a head-
light. There is evidence one was absent, but the uncon-
tradicted proof is that these headlights go out from
one unexpected and unavoidable cause or another.
There is uncontradicted evidence this engine started
with a going headlight from Poplar Bluff; and shall
we presume, because it was out at a certain time and
for a certain distance, that the absence of such light
is negligence in a country district between crossings
where defendant was entitled to a clear track and had

no reason to expect the track was not clear? Certainly not.

Taking the case made below and presented here, we are of opinion defendant's demurrer to the evidence should have been sustained, and we so hold.

VI. In coming to the foregoing conclusion we have construed the allegation in plaintiff's petition relating to the use and custom in making a pathway of defendant's track in the most favorable light possible. That allegation is scanty, indeed, and is compressed in one line, to-wit, "he was, with the permission of defendant, by long use and custom, walking on," etc. A close view of that allegation might be that the custom and use relied on were a custom and use singular to plaintiff and did not embrace the public at large. But the case was tried below on the theory that the permission to plaintiff arose from the fact of long public use of the track; and the case having been tried on that theory on both sides, the insufficient averment in the petition is not fatal. [Bragg v. Railroad, 192 Mo. l. c. 358, and cases cited.]

The judgment, being unsupported by proof of negligence, must be and is reversed.

All concur.