## SOUTHERN KANSAS RY. CO. OF TEXAS v. BARNES. (No. 699.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 9, 1915. On Motion for Rehearing, Feb. 13, 1915.)

1. EVIDENCE ⟨Key⟩375—HANDWRITING—ADMISSIBILITY.

Where, in an action for negligent death of a brakeman struck by a passenger train, there was evidence of the finding near the place of the accident of an envelope containing in pencil the statement that decedent was thrown from a freight train onto track and was caught by a rail, and a witness knowing decedent's handwriting testified that the statement was written by decedent, the statement was properly received in evidence as against the objection that it had not been properly identified and shown to be the writing of decedent.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1591, 1602, 1604, 1606; Dec. Dig. ⟨Key⟩375.]

2. EVIDENCE ⟨Key⟩382—ADMISSIBILITY—OBJECTIONS.

Where a writing was properly received under the evidence when offered, the fact that subsequent evidence attacked the identity and genuineness of the writing did not render the ruling improper, but the party complaining should renew his objection to the admissibility of the writing.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1658, 1659; Dec. Dig. ⟨Key⟩382.]

3. RAILROADS ⟨Key⟩367—OPERATION OF TRAINS—LOOKOUT.

A railroad engineer must, for the safety of his passengers and of persons who may be on the track, keep a lookout in the daytime or at nighttime for persons and obstructions on the track.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1257, 1258; Dec. Dig. ⟨Key⟩367.]

4. MASTER AND SERVANT ⟨Key⟩278—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE.

Evidence held to sustain a finding that an engineer operating a passenger train running over a freight brakeman thrown from a freight train on the passenger track was guilty of negligent failure to keep a lookout.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⟨Key⟩278.]

5. MASTER AND SERVANT ⟨Key⟩265—INJURY TO SERVANT — NEGLIGENCE — EVIDENCE—BURDEN OF PROOF.

One suing for the death of a freight brakeman thrown from the train and onto a passenger track, and there run over by a passenger train while unable to move from the track, has the burden of proving the negligence of the freight conductor in failing to discover decedent on the track in time to avoid the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. ⟨Key⟩265.]

6. TRIAL ⟨Key⟩85 — EVIDENCE — OBJECTIONS — SUFFICIENCY.

A general objection to evidence, as a whole, is untenable, where a part is admis-

sible, and the overruling of the objection is not error.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. ⟨Key⟩85.]

7. DEATH ⟨Key⟩99 — ACTION FOR NEGLIGENT DEATH—DAMAGES—EXCESSIVE DAMAGES.

A verdict for $2,500 for the death of a man 33 years old, earning $80 per month, leaving surviving his parents, 70 and 71 years old, respectively, will not be disturbed, where decedent had contributed something like $110 in money to the parents after his attaining majority, and had contributed labor on his parents' farm at different periods.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. ⟨Key⟩99.]

### On Motion for Rehearing.

8. MASTER AND SERVANT ⟨Key⟩278—INJURY TO SERVANT—NEGLIGENCE.

In an action for the death of a freight brakeman thrown from a freight train onto a passenger track and run over by a passenger train, evidence held not to show the negligence of the freight conductor in failing to discover decedent on the track in time to avoid the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⟨Key⟩278.]

9. NEGLIGENCE ⟨Key⟩56 — PROXIMATE CAUSE — ACTS CONSTITUTING.

Where several causes concurred to produce a result, any one of them could be the proximate cause, provided it was an efficient cause, but the proof must show a proximate connection between the wrong and the injury complained of.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 69, 70; Dec. Dig. ⟨Key⟩56.]

10. APPEAL AND ERROR ⟨Key⟩995—VERDICT—EVIDENCE—REVIEW.

An appellate court will not weigh conflicting evidence and balance probabilities and draw inferences in determining an issue of fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3907; Dec. Dig. ⟨Key⟩995.]

11. NEGLIGENCE ⟨Key⟩56—"PROXIMATE CAUSE" —ACTS CONSTITUTING.

Where there is no reason to expect an injury and no knowledge in one doing a wrongful act that such a state of things exists as to render an injury to another probable, the wrongful act is not a proximate cause, which depends on the question whether a reasonably prudent man, in view of the facts, would have anticipated the result, though not necessarily the precise actual injury complained of, but some like injury produced by similar agencies.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 69, 70; Dec. Dig. ⟨Key⟩56.]

12. MASTER AND SERVANT ⟨Key⟩146—OPERATION OF TRAINS—CARE REQUIRED OF TRAINMEN.

The rule of a railroad company that conductors are expected to see that the trainmen are on the train before leaving a station does not prevent conductors from relying on the presumption that trainmen will get on the train and be at their ordinary places of duty.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 284; Dec. Dig. ⟨Key⟩146.]

Appeal from District Court, Lipscomb County; F. P. Greever, Judge.

Action by Thomas Barnes, administrator of A. P. Barnes, deceased, against the Southern Kansas Railway Company of Texas. From a judgment for plaintiff, defendant ap-

⟨Key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

peals. Reversed, and motion for rehearing overruled.

Terry, Cavin & Mills, of Galveston, Hoover & Hoover, of Canadian, and E. C. Gray, of Higgins, for appellant. L. C. Barrett, of Amarillo, Frank Willis, of Canadian, and J. M. Jones, of Amarillo, for appellee.

HENDRICKS, J. The appellee, Thomas Barnes, as the personal representative of the estate of A. P. Barnes, deceased, instituted this suit against the Southern Kansas Railway Company of Texas, in the district court of Roberts County, Tex., upon an agreed change of venue to Lipscomb county, the cause was tried to a jury in the district court of the latter county, resulting in a verdict against the appellant railway company in the sum of $2,500. The deceased, A. P. Barnes, at the time of his death, was a brakeman upon one of the railway company's freight trains engaged in interstate commerce. A short time previously to his death the train upon which he was engaged as a brakeman, consisting of a locomotive engine and about 63 freight cars, engine, and caboose, on the night of the 16th of August, 1912, in moving from the east, had gone in onto a passing track at a point east of the depot in the town of Higgins, moving westward, for the purpose of permitting an eastbound passenger train, seven cars, and engine, then about due, on its journey to Kansas City, Mo., to pass said freight train; said passenger train at said time also engaged in interstate commerce. The main track at the town of Higgins is in a general direction east and west, with the east beginning of the passing track at a point, according to certain testimony, a quarter of a mile, and, from other testimony, a half mile, from the depot; said passing track, the best we can infer from the record, being from 90 to 100 car lengths east and west, immediately south and parallel to the main track. According to the defendant railway company's testimony, the particular freight train upon which the deceased, A. P. Barnes, was engaged, headed in westwardly on the passing track, and the engineer spotted the train with the engine at a water crane for the purpose of obtaining water, and, according to its contention, with the whole of said train upon the passing track, with the way car not entirely clear, in that it was a few feet east of the clearance post toward the frogs; that the conductor, Heath, in charge of said freight train, at the time the engineer had stopped at the water crane, left the deceased, A. P. Barnes, at the rear end of said train near the caboose, and standing on the ground between the caboose and the main track, for the purpose of protecting that part of the train; that the conductor walked the length of the train to the engine, informing Burke, the engineer in charge, that the rear end of said train was not quite in the clear,

173 S.W.—56

directing him to clear the main track, and the engineer thereafter moved his train westwardly on up the passing track, and, after the passenger train going east had come in on the main track, said freight train proceeded on its journey to Canadian.

The conductor, Heath, in charge of said freight train, testified that, when his train headed in on the passing track at the east, he closed and locked the switch at that end, and after the passenger train came in on the main track, headed east, that he also closed the switch at the west end, giving the "highball" to the engineer for the continuance of the journey; that after this was done he noticed the absence of the rear brakeman Barnes from the rear of the train, however, assuming that, on account of previous trouble with hot boxes, said Barnes was at the head of the train, and after arriving at Canadian, the first stop, he telegraphed back the information, which caused an investigating party from Higgins to go to the switch at the east end, resulting in the discovery of the remains of said Barnes.

Keeping in mind the southerly curvature of the switch deviating from the main track, the best we can deduce from this record is that the searching party discovered the lantern of the brakeman Barnes standing between two ties and between the north rail of the main track and the north rail of the passing track at some point in the switch where the south curvature and deviation of the passing track from the main track occurs. The deceased's gloves were found practically opposite, with a railroad tie between, between the south rail of the main track and the south rail of the passing track, at some point within the same curvature of the passing track where it deviates from the main track. The trunk and legs of the deceased were found from 60 to 75 feet, according to different distances by different witnesses, on the main track east of the place where the lantern and gloves were situated, and in the following position: The trunk of the body was on the outside of the south rail of the main track (with the head severed therefrom), and the legs between the rails opposite. Between this point and the point where the lantern and gloves were situated, the head of the deceased was discovered, a few inches south of the south rail of the main track.. A short distance east of his gloves the deceased's watch was discovered, with the crystal broken, with the stem and chain located further east; and, between the places where the lantern and gloves and the body were situated, pieces of clothing, a pocketbook containing money, and other small articles of personal property, were also discovered—clearly indicating that the body of the deceased had been struck at some point west of where it was found and dragged east by the movement of the train.

East from the depot at Higgins, the main

track of the railway company was practically straight and level. For some distance (just what space we' are unable to ascertain) at the place where the passing track and the main track are connected, said tracks were partially in a "skeleton" condition; that is, the ballast was not to a standard level, leaving some open space between the bottom of the rails and the roadbed.

The engineer in charge of the passenger engine which killed Barnes testified that at the station 'of Quinlan, in Oklahoma, after receiving a certain telegram with reference to the matter, hair and blood were discovered on the cow catcher of his engine, and hair was also discovered on a footstep stationed at the right side and the bottom of the pilot.

[1] The plaintiff, appellee here, offered and introduced in evidence an envelope postmarked "St. Louis, Mo., July 6, 12 M. 1912," addressed to "A. P. Barnes, Canadian, Texas," with the return inscription, "The Durbin Automatic Train Pipe Connector Co., Chemical Bldg., St. Louis, Mo. ;" and on the envelope' was the following lead pencil writing: "Train started jerk(ed) of (off) way car, broke leg and arm, leg fastened under rail, can't get loose, 14 at depot, light out, can't reach it, bye-bye." The punctuation by commas and the parentheses are ours.

Guy Chelf, a locomotive fireman of the defendant company, introduced as a witness for the plaintiff, testified that he found this particular note in a folded condition with a "little red rock on it," from four to eight feet from the rail, in a clear space, stating that it was "pretty well straight from his lantern" (meaning the deceased's lantern); further saying, "As well as I can recollect, it was out to one side, even with his gloves and lantern."

Lambert Barnes, an older brother of A. P. Barnes, testified:

"I have seen him (meaning A. P. Barnes) write many times. I think I have seen him try to write and looked at his writing where he did not have facilities to write with—did not have a place where he could put it down on a table, or where the light was not good, ·or it was dark—but I do not remember any particular instance. * * * I know his handwriting and have read a number of his letters. That note that you hand me * * * looks to me like his handwriting. I do not have any doubt about it. * * * I believe it to be."

He testified that he had seen the deceased practicing writing, and "studying," and that he had helped him to learn to write, and that was the only reason he knew his handwriting, and that deceased had practiced writing without looking at it, and that he had "tried that with him." The witness compared the note in question with letters of the deceased, declaring a similarity between the same, considering that the note, as witness stated it, "is one (written) under difficult conditions." He also said:

"I have seen my brother write under difficult conditions; therefore I would say that he

wrote that. The general appearance of it looks familiar and the character of the letters."

F. S. Gunn, plaintiff's witness, who had testified in regard to the finding of the deceased's body, also testified that he was informed in regard to a letter having been found "at the place of the accident, purported to have been written by the deceased Barnes." He said that the brakeman, who claimed to have found the letter, showed him (Gunn) the place where the same was found—how far from the switch stand, the main track, and how far from the side track. He further said:

"The ground was scraped clean, and the letter could have been plainly seen at all times. I am not sure about having been over the place the next morning after the accident. I was over the ground on the Sunday afternoon following. This occurred Friday night. If the letter had been there the next morning, 1 would have seen it, *if I went over this place.*"

Appellant assigns that:

"The court erred in permitting the plaintiff to read in evidence to the jury the writing on an envelope purporting to have been written by A. P Barnes just prior to his death, * * * etc."

And, extracted from the statement in the brief, appellant's objections to the introduction of the note were:

"Because the same was misleading and had not been properly identified, and not shown to be the writing of A. P. Barnes, and because under the conditions under which the same was found, as shown by the testimony, conclusively showed that the same could not have been written by A. P. Barnes."

[2] Subsequent to the introduction of the note in evidence, and the objections by defendant to its introduction, there was considerable other testimony introduced of a character attacking the identity and genuineness of said note. At any other time subsequent to its introduction, appellant did not request its elimination from the record, nor is there any assignment addressed to the consideration of the appellate court that the strong preponderance of the evidence is against the genuineness and the identity of said note.

At the very time and in the condition of the testimony, when the note was introduced by plaintiff, and the objections, as mentioned, were made by the defendant, the court, we take it, could not have done otherwise than have permitted its introduction. Appellant, in its statement subjoined to its assignment, for the purpose of supporting its contention, in attempting to impeach the note, is also using the record and the testimony of the witnesses, which was not in the mind of the trial court, nor addressed to his consideration as bearing upon the genuineness of the document, at the time it was introduced. The testimony, which we have attempted to give in substance, precedent to the introduction of the writing, was not sufficient to support the character of objections made at that time, permitting the court to reject it from the testimony; and it is to be noted that

there is no objection (without saying that it would be good) that said note was not admissible as res gestæ testimony; but we are unable to consider the full force of the appellant's argument in the condition of the assignment, relevant to the objections when made.

[3, 4] The fourth, sixth, fifteenth, and sixteenth assignments of error in appellant's brief will be considered together as relative to the same subject:

The fourth is:

"Because the court erred in permitting the plaintiff to prove by the witnesses, Ira Simmons, Claude Cravens, and other witnesses, * * * that a person on the track where A. P. Barnes was killed, an engineer coming from the station at Higgins, or the fireman, if they had been on the lookout, could have seen him on the track for a distance of from one quarter to one half a mile."

The objection is that this is not such a case as that the operators of the train were bound to keep a lookout at the time and place where the deceased was killed; that under the law the defendant was only required to use the means at its command to prevent injury after the danger of the deceased became apparent to the operators of the train.

The sixth assignment of error is based upon a peremptory instruction and upon the proposition that the undisputed testimony shows that Barnes was killed at a time and place that the operators of said train had no reason to believe that said Barnes, or any other person, was on the track; and that said evidence showed that the engineer and fireman were in their proper places and were upon the lookout and did not discover said Barnes in a perilous position.

By the fifteenth assignment of error appellant complains that the court erred in submitting the seventh paragraph of his charge to the jury on the question of defendant's negligence, because there was no evidence justifying said charge, and because there was no duty on the part of the operators to keep said lookout.

The sixteenth assignment of error is based upon the refusal of the trial court to give the following special charge:

"The defendant asks the court to charge the jury that in law as applied to this case, until it is known from the evidence what occasioned the injury, or what occasioned the deceased to be upon the track of the defendant, it cannot be said that the defendant was guilty of some negligence that produced the injury. The jury will not be permitted to assume negligence by reason of the fact that the deceased was killed. The negligence alleged and submitted as a ground of recovery in charge of the court must be proven by a preponderance of the evidence, otherwise it will be the duty of the jury to return a verdict for the defendant."

Relevant to this question the trial court charged as follows:

"(6) It is the duty of the employés of a railway company, operating its trains, to use ordinary care to discover and avoid injuring persons who may be upon or near its tracks, the degree of such care being such as a person of ordinary prudence and caution would commonly exercise under the circumstances, and varying, as the known probabilities of danger may vary, along the difficult portions of the route over which such trains are run; and a failure to use such care by its employés is negligence upon the part of such company.

"(7) Bearing in mind the foregoing definitions and instructions, you are charged that if you find and believe from the evidence in this case, by a preponderance thereof, that on or about the 16th day of August, 1912, the plaintiff's son, A. P. Barnes, was in the employ of the defendant, assisting to operate a freight train as rear brakeman, and at a point near Higgins, Tex., and while in the exercise of ordinary care for his own safety, was thrown from said freight train onto the railroad track of the defendant, and was so injured or fastened upon the track of the defendant that he could not move himself therefrom, and that a passenger train of defendant came along such track in a short time after such fall, if any, and ran over and killed him, and you further find that the servants or either of them, operating either or both of said trains, in the exercise of ordinary care, keeping a proper lookout, would have discovered said A. P. Barnes on the track and in danger, if he was in such position, in time for such servants and employés, by the use of ordinary care, to have avoided said killing, and such servants failed to use such ordinary care, and you further find that such failure, if any, on the part of said railway employé, was negligence and the proximate cause of the killing and death of said A. P. Barnes, and you further find that plaintiff and wife, as a proximate result thereof, sustained loss and damage, you will find for the plaintiff, unless you find for the defendant under other instructions given you in this charge."

Guy Chelf testified:

"Standing where Barnes was killed, looking towards the depot in the daytime, he [Chelf] could see right at a mile west of the depot. The track was straight and level."

The passenger engine of the train which struck Barnes was furnished with an electric headlight. Johnson, the locomotive fireman on the passenger, said:

"If I saw down the track and saw something on it, I would stop. If you can only see 300 or 400 yards, the proper thing for you to do is to run fast enough (slow enough) so that if you could see anything on the track you can stop before you get to it."

The engineer in charge of the passenger train, witness for defendant, said:

"We had an electric headlight, and it threw a light down the track. You can see a man sitting hunkered down on the track, I should judge, in the neighborhood of 300 yards. That night, going the speed I was going, if I had discovered a man 300 yards ahead, I could have stopped. * * * An object on the rail shows quite a little distance. I judge that I might see an object on the rails as far as I could have hunkered down. * * * An object on the track we can see ahead of us, but when the engine gets up close it obscures it; but we have seen the ground over there. The full track is obscured in the neighborhood, I should judge, of 20 yards—that would be 60 feet."

We are assuming this witness means that, on account of his position in the engine and the character of light that he had, the distance of which he speaks upon the track as being obscured is in the dark next to the engine. This same engineer testified:

"When we saw the blood on the engine I did not think we would be charged with negligence; and if the man had been on the track it would be negligence if I did not see him."

The fireman Johnson said that his duty was to "keep the fire going to keep the water in the injector, and when you have nothing else to do you are supposed to be sitting in the seat box looking out."

The engineer testified with reference to a previous interrogatory answered by him in some deposition:

"I answered to the thirty-second interrogatory that there was about 10 feet in front of the engine that I could not see on account of the range of light. That is what I had reference to. * * * Yes, sir; the range of the headlight is in front of the engine rail the whole track on my side, and the opposite side, on account of the headlight not giving light up close there, is part of the whole track that (is) obscured. The range of the headlight is 10 or 12 feet in front of the pilot. I never measured it; it is just a guess. * * * What I am trying to explain is that question in a deposition had reference to the range of the headlight and this to the full track."

Bearing in mind the approximate distance to the switch, Johnson, the fireman on the passenger, said:

"Ordinarily the train (leaving the station) should go the first mile in three minutes."

Burke, the engineer on the freight train, testified:

"That if a man the size of Barnes was there and had his foot hung, "with an electric headlight, a man leaving the town of Higgins * * * would be likely to see a dark object; * * * the engineer could see a dark object if he was looking for a quarter of a mile. He could stop the passenger train within a quarter of a mile, if he knew what the dark object was."

Heath, the conductor of the freight train, said on cross-examination by appellant:

"It would be difficult to see a man lying between the rails, but he could be seen standing on the track for a half mile."

But previously, on direct examination, he had said:

"With this headlight in its then condition (meaning the electric headlight on the passenger) the body of such a size man as the said A. P. Barnes could be seen probably half a mile. I did not discover the body of the said A. P. Barnes on the track or near the track at the time this passenger train was passing out of Higgins"

—from which it could be inferred that he meant the body of Barnes in some recumbent position.

Guy Chelf said:

"There is about a rail that an engineer cannot see. It is a fact that "when he is sitting in his position, by reason of the light in his engine, for ten rails he cannot see, because the light goes ahead of his engine. * * * If a party came upon the track he could see him for a mile. * * * Engineers will stop if they see anything on the track, if they have time. * * * If there was an object on the track, and it did not move, they would always stop for it. They would stop whether it moved or not, unless they knew for sure what it was. * * * Headlights are on the train for safety, making a light for the engineer to see by. He wants to see to tell what he is doing and where he is going. He could see for a mile ahead of him on a straight track. That was a

straight track from the depot. The light threw a light upon this place where he was killed from the depot. * * * No obstructions."

The engineer further testified:

"In pulling out of a station * * * the engineer gets a signal, and as he pulls out he tries to get up speed with as little jerks and as smooth as possible, and then he watches the water. * * * We have to see that we have our water and see that the water does not get too high and keep a general lookout as to the condition of the air gauge; and sometimes we have to open our cylinder cocks; and sometimes we have to be handling our throttles and reverse levers. *We are supposed to keep a watch ahead and perform those duties too.* When I pulled out of Higgins on the night of the 16th of August, 1912, I was performing those duties—all of them. I did keep a lookout ahead. I did not see anybody on the track nor any object on the track. * * * I did not have any reason to suspect that he or any one else would be on the track near there."

The testimony also showed that the track was fenced at the place where the accident occurred, and the use of this track by pedestrians or by others at the point indicated is not shown by the plaintiff; and ordinarily speaking, aside from the duty of the engineer and fireman of a railway company to exercise ordinary care to discover persons and objects upon the track, the particular place was not such as one would ordinarily expect a person upon the track.

The Supreme Court, in the case of H. & T. C. Ry. Co. v. Sympkins, 54 Tex. 621, 38 Am. Rep. 632, said:

"If the engineer on *the approaching train keep that lookout which is required of him at all times, not only to secure the safety of the train, but to avoid injury to any animal or person on the track, this person lying there in open view must be discovered. Not to discover him is, under the circumstances, negligence, and that negligence is the proximate cause of the injury. * * * In our opinion, there is a distinction between the duty devolving on the owners of land on which there is a dangerous excavation, and that devolving on a corporation invested by law with the extraordinary power of traversing the country with huge cars, whose progress everywhere is necessarily attended with danger. They who place such dangerous machines in motion should, we think, be required to take precautions against their injuring any one who may happen to be in their pathway. The care in conducting any business should be proportionate to its dangerous motion.' Gorman v. Pac. R. R. Co., 26 Mo. 448 [72 Am. Dec. 220]. * * * The duty of watchfulness has often been enforced against railroads in cases of injuries to cattle trespassing on their track, and that, too, in the absence of any statutory provision or in cases outside of the statute. Isbell v. N. Y. & N. H. R. R. Co., 27 Conn. 393 [71 Am. Dec. 78]; Gorman v. Pac. R. R. Co., 26 Mo. 442 [72 Am. Dec. 220]; Chicago & N. W. R. R. v. Barrie, 55 Ill. 226; Kerwhaker v. C. C. & C. R. R. Co., 3 Ohio St. 172 [62 Am. Dec. 246]. We prefer that line of decisions holding railroads bound to exercise their dangerous business with due care, to avoid injury to others, as correct in principal and sound in policy, and as protecting even a trespasser who is not guilty of contributory negligence."

Justice Stayton said in the case of Railway Co. v. Hewitt, 67 Tex. 479, 3 S. W. 708, 60 Am. Rep. 32:

"Ordinarily railway companies, running cars propelled by steam, have the exclusive right to the use of their tracks, except at such places as they are intersected by public crossings or such private ways as they may permit, and they may therefore expect that no one will violate this right, and may rely upon a clear track; but it is very generally held that, notwithstanding this, such is the hazardous nature of the business in which they are engaged, it is the duty of such carriers, not only for the safety of their passengers, but for the safety of any one who may be on the track, to keep a lookout."

In the case of Texas & Pacific Railway Co. v. Watkins, 88 Tex. 22, 24, 29 S. W. 232, 233, in an opinion rendered by Associate Justice Denman, after reproducing portions of the opinion in the Sympkins and Hewitt Cases, said:

"The true rule is that it is the duty of the servants of the railroad company operating its trains to use reasonable care and caution to discover persons on its track, and a failure to use such care and caution is negligence on the part of such company, for which it is liable in damages for an injury resulting from such negligence, unless such liability is defeated by the contributory negligence of the person injured, or of the person seeking to recover for such injury; and the circumstances under which the party injured went upon the track are merely evidence upon the issue of contributory negligence. If such circumstances show that the party injured was a wrongdoer or trespasser at the time of the injury, the issue of contributory negligence is, as a general rule, established as a matter of law."

Appellant cites the case of Missouri, Kansas & Texas Ry. Co. v. Malone, 102 Tex. 273, 115 S. W. 1159, wherein Chief Justice Brown uses the following language:

"The reason for requiring a railroad company to use the care specified to avoid injuring persons who were walking upon its track at a place where it is commonly used is that such use notifies it that people are liable to be there; therefore operatives of trains must use ordinary care to discover them and also use such care to avoid injuring them."

We presume the immediate following language used by Justice Brown is impressing appellant in this matter, wherein he states:

"The rule does not apply to the same place when used at night, if the company had notice only of the fact that the public used the track in the day time. The facts must be such as would cause an ordinarily prudent person, under similar conditions, to expect to find people at that place at that time"

—citing Bradley v. Railway Co., 80 Tex. 84, 16 S. W. 55; Frye v. Railway Co., 200 Mo. 377, 98 S. W. 566, 8 L. R. A. (N. S.) 1069, by the Missouri Supreme Court, which shows the facts, actuating the holding, different from this record.

In the Malone Case, where the language quoted is used by Justice Brown, the injured person was a trespasser upon the track at night. The declaration of a legal principle is interpreted by the facts pervading the case in the mind of the judge writing the opinion. Justice Brown did not mean by the declaration in the Malone Case that under conditions where the injured person was not guilty of contributory negligence, or was not a trespasser upon the track whether in the day time or at night, the railway company, if it failed to exercise ordinary care in keeping a lookout, and injured a person rightfully upon the track, would not be guilty of negligence.

In the case of Texas & Pacific Railway Co. v. Staggs, 90 Tex. 461, 39 S. W. 296, Justice Brown, in declaring principles upon a certified question, which evidently he thought may be applicable to the conditions of the case, said:

"If the deceased was not guilty of negligence in being or remaining upon the track of defendant's railroad, and if the employés of the railroad company failed to use such care as a person of ordinary prudence would have exercised, under like conditions, to discover his presence upon the track, the widow and children of the deceased would be entitled to recover for his death, if caused by such negligence of the railroad company."

However, stating the familiar rule following the above enunciation that, if the defendant was guilty of contributory negligence, the widow could not recover for failure to discover the presence of her husband, and further enunciating the doctrine of discovered peril. Hence we say, reverting to first principles, announced and reaffirmed several times by the Supreme Court of this state, that with reference to the duty of the railway company, generally speaking, it is one to keep a lookout either for persons or obstructions in the daytime or in the nighttime upon its track. The nature of its business and character of its machinery have evidently influenced our Supreme Court to generally adopt this principle. Of course the quantum of diligence varies according to conditions. Under some conditions more diligence is exacted, and under others less. Appellant seems to rely upon two propositions referable to its negligence and liability as applicable to the conditions here; that is, first, that Barnes was killed at a place where it could not be reasonably expected that he would be upon the track, and hence the duty to watch for obstructions or persons upon the track is lessened; and, second, the duty did not devolve upon the engineer to stop the train under the circumstances in this record, unless Barnes was actually seen upon the track—appellant combining and applying both doctrines. Ordinarily, in this state, negligence is the failure to use ordinary care. Bearing in mind the principles enunciated by the Supreme Court, as applied to the facts reproduced by us as to the surrounding conditions with reference to the clear track—the electric headlight, the testimony of the railroad witnesses as to their duty under the conditions with reference to a lookout, the rate of speed, and distance traveled from the station to the place where the accident occurred, and the distance within which the train could have been stopped, and the deceased upon the track, whether his body would be regarded as a human be-

ing or an obstruction—and resolving the testimony, and what we consider to be legitimate inferences therefrom, favorable to the plaintiff, we think that the evidence was sufficient as to the negligence of the defendant causing the death of the deceased, to take the case to the jury. Considering the note, claimed to have been written by the deceased, as res gestæ of the conditions surrounding him at the time, and which we are unable to exclude from this record, the deceased, at the time of the accident, was upon the main track with his leg fastened under a rail, and whether signaling the engineer, actuated by a spirit of self-preservation, or lying upon the track awaiting his death (if he was there as he states), his position was such, if the jury believed this testimony, that an engineer leaving a station with the character of headlight in front of his engine as indicated in this record, considering the nature of the business and the duty to watch the track, we are unable to say that the body of a man upon the track, if ordinary care had been exercised, could not have been discovered within sufficient time to have avoided the injury; we have to presume the jury thought so, and we are unable to set aside that inference, as applied to this record.

The case of Caldwell v. H. & T. C. Ry. Co., 54 Tex. Civ. App. 399, 117 S. W. 491, considerably relied upon by appellant, held that the deceased, lying upon a track, prima facie was guilty of contributory negligence; and hence "the burden then rested upon the appellants. if they wished to base a recovery upon negligence in failing to discover him sooner to furnish evidence sufficient to authorize the jury to acquit him of contributory negligence," meaning, of course, if the deceased was not guilty of contributory negligence, the duty of ordinary care to discover him would apply, as distinguished from the doctrine of discovered peril. The remarks of the court must be interpreted with the facts. The case is really more opposed, than in favor of, the position of appellant. The deceased was across the track, probably drunk, and, though an employé, was using the track as a footway, and was not a licensee. The numerous cases cited by appellant from the Missouri Supreme Court bear considerable stress, it is true, upon the place where the injury occurred, with reference to the lack of expectation on the part of train operatives to discover the party at such a place; and they discuss what is termed the "last clear chance" doctrine, which is practically our doctrine of discovered peril. In the Missouri cases cited, the position of the injured party is tinged with contributory negligence on account of the position assumed, in the place situated, when struck by the train.

In the case of Aerkfetz v. Railway Co., 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758, relied upon by appellants, the Supreme Court of the United States simply held that the operatives of a switch engine in a busy railroad yard had the right to act upon the belief that employés working in the yard would be mindful of the movement of trains, and would take reasonable precaution of their approach, and that upon such conditions, where one with his back to a slowly moving switch engine, where its approach could be easily detected, was struck, the railway company was not guilty of negligence, and the injured was guilty of contributory negligence. In this record the deceased was not a trespasser; neither can we infer that he was in any manner guilty of contributory negligence. Of course the federal Employers' Liability Act is exclusively a federal question, in the sense that the Supreme Court of the United States, by its interpretation, would control upon this question. We are unable to find any contravening holding of that court, to that of our Supreme Court, either as to this act with reference to negligence, or previously to the passage of the statute, in discussing negligence. Hence we will follow what we conceive to be the rule propounded by our higher courts. As to the contention that Barnes could not have been jerked from where the way car was situated to where his gloves and lantern were found was for the jury, if they believed the genuineness of the note.

[5] We are of the opinion, however, that paragraph 7 of the court's charge, complained of by the twenty-second assignment of error, and properly objected to, and assigned in the motion for new trial, is error. It is noted that the court charged that it was the duty of the operatives of the passenger train to exercise ordinary care to discover Barnes upon the track, which we hold to be correct. He also instructed the jury if they found that the servants of the freight train (as well as the servants of the passenger), in the exercise of ordinary care, would have discovered Barnes "on the track and in danger" in time to have avoided his death, and failed in this respect, and such failure was negligence and the proximate cause of the death of Barnes, to find for the plaintiff, which we think insufficiently supported by the testimony.

The burden is upon plaintiff to establish this negligence. Heath, the conductor of the freight train, did testify that it was his duty to see that his brakemen were upon the train when leaving the station, and the testimony does show that the freight train left Higgins before the passenger. The freight train was in Higgins about 35 minutes, and, as stated, Heath had walked the length of the train to the engine, informing the engineer, at the water tank, that the caboose was not in the clear; and the latter moved the train west and again stopped; and the passenger train, which was late, came in on the main track, stayed at the depot from four to ten minutes, and then proceeded east—the fireman of the

passenger engine testifying that after leaving the station they would run the first mile in about 3 minutes, an average speed of about 20 miles per hour. The engineer and fireman of the freight testified that in moving from the water crane they gave two blasts—signaling the trainmen—when they made the first move into the clear. Heath also said that in leaving Higgins he discovered that Barnes was not on the rear end—supposed that he was on the front end on account of some troublesome hot boxes. Whatever part of the testimony the jury were justified in not believing, we are unable to see in what manner, and by the exercise of what diligence, as a proximate cause, measured by the circumstances in this record, that it could be said that Heath, by a proper lookout, or by the exercise of care, after he had discovered the absence of Barnes from the rear end, could have discovered Barnes at the east end of the switch, upon the doctrine of anticipation of consequences, and could have prevented the passenger train from killing him. Heath is not shown to have been upon the train at Higgins, except when he left the east end of the switch to go to the engineer, and again, when he closed the west switch and jumped the caboose, two-thirds or three-fourths of a mile from the east switch, where he last saw Barnes.

Appellee says that Conductor Heath had notice of such facts as put him upon inquiry, which, "had it been followed up, would have led to the discovery of Barnes on the track before the passenger train killed him," and again says:

"The testimony, in substance, was that it was the duty of Heath then to have looked after Barnes and given the signal to the passenger train not to proceed, which he could have done, but which he did not do. S. F. pp. 6, 7, 9."

We do not find any testimony as to the duty to signal the passenger train, nor is there any disclosed, according to our view, that would create the inspiration to Heath, as an ordinarily prudent person, that because he last saw Barnes at the east end, and did not see him when he was leaving Higgins, to whistle to the passenger not to proceed. The leading case of Texas & Pacific Railway Co. v. Bigham, 90 Tex. 223,[1] is quite full on the question of proximate cause. We think appellant is correct as to the insufficiency of the testimony on this question, and in the condition of the record we hold the charge harmful. Southern Kansas Railway Co. v. Sage, 98 Tex. 438, 84 S. W. 814.

[6] We notice the eleventh assignment of error in this manner: The appellant offered 24 questions and answers in a purported deposition, claimed to be questions propounded to, and answers made, some by the mother, but principally by the father, of the deceased. The depositions were unsigned by the parties. They contained the authority and directions to the notary usual for ex parte depositions,

with the notary's certificate thereafter attached, to the effect that the answers were reduced to writing, read over to the witnesses, acknowledged by them to be correct, and that said witnesses refused to sign the same. The bill of exceptions also stated that the notary had testified that the statements were freely and fairly made by the witnesses. All the documents, including the directions to the notary, were offered. Of course they were not admissible as ex parte depositions under the statute. The assignment is that the court erred in refusing to permit the defendant to read to the jury the papers and statements made by Thomas Barnes and Mary Barnes; and in the statement, subjoined to the proposition, there is certain evidence pointed out which appellant is evidently insisting should have been admitted, though, when we go to the bill of exceptions, there is considerable other matter which is very questionable whether it should have been admitted—some things already proven conclusively; some matters irrelevant—as the documents could not be offered as a deposition. It may be true that the proof was sufficient to identify material statements as admissions by the parties who were the real beneficial plaintiffs of the suit. The established rule in this state is that a general objection to evidence as a whole is not tenable where part of it is admissible, and overruling such objections does not constitute error. If a part of this testimony is admissible and other parts inadmissible, neither has the appellee nor the appellant separated the admissible from the inadmissible. Nearly all the cases, where a general objection is made, is where the evidence is partially admissible and partially inadmissible, and the objections are overruled, casting the burden upon the objector to separate the good from the bad; but we are in doubt as to the rule, and do not decide it, where the evidence is rejected and neither party—the one offering, nor the objector—attempts a separation. Jones, in his Commentaries on Evidence (the Blue Book of Evidence, vol. 5) § 894, pp. 376–377, states:

"It is a familiar rule that a mere general objection to testimony as a whole does not avail when one part of the testimony is admissible. * * * The rule that the objection should be specific has no application, however, where a general objection is sustained. In that case the party against whom the ruling was made cannot urge that the objection was too general."

Also see Missouri, K. & T. Ry. Co. of Texas v. Burk, 146 S. W. 600; also Williams v. Neill, 152 S. W. 694, wherein there seems to be some contradiction. This could probably be avoided upon another trial.

There are numerous assignments in this record that the personal representative cannot recover for the reason that the beneficiaries under the statute, the father and mother of the deceased, have not proven a reasonable expectation of pecuniary benefit from the continuance of the life of the adult son.

[1] 38 S. W. 162.

[7] The recovery in this case was the sum of $2,500; the evidence showing that the deceased was about 33 years of age at the time of his death and had contributed something like $110 in money to the parents of the deceased at a period subsequent to his majority, several years ago; that he was earning $80 per month, and previously to his employment as brakeman by the defendant, at different periods, had contributed labor upon his father's farm in Indiana. The father was 70 years of age and the mother 71 at the time of his death, with an expectancy of about 8 years. The father testified that he saw deceased at his home in Indiana about 12 months before he was killed. The parents had a 158-acre farm, and up to the time of the death of the deceased they were living upon the farm, assisted at intervals by another son, "who comes and goes," and by an adult daughter, who seems to have been permanently at home. The father testified that the single son on the farm received a part of the produce in compensation for his labor, and that, if the deceased had come home upon call and worked upon the farm, he would have taken charge "for part of what he made on it." The deceased had made frequent declarations that he desired work near home, so as to be with his parents more and be better able to take care of them. Appellant contends that the money was in the nature of presents and not in the nature of contributions. In this character of action a new action is given to the personal representative against the person who would have been liable to the decedent had he lived. Though the foundation of the administrator's complaint is the wrongful injury to the deceased, the damages and its measure are entirely different; and where the action is brought for a beneficiary legally entitled to the loss or support of the deceased, as in the case of the husband, the wife, a minor child, or parent of a minor, the measurement of the loss is necessarily more certain and more easily measured and recovered; but where the pecuniary loss is to beneficiaries who base their claim, not upon the legal liability of the deceased, but upon gratuities in the past or upon reasonable expectation of pecuniary benefit from the continuance of the life of the adult decedent, the authorities are not altogether harmonious. While, of course, there is some difference between a gift and a contribution for the purpose of support, but where the adult has given to the parents (not legally required to do so), it is a gratuity, and we are unable to say that the testimony of the contributions of money in this instance is altogether inadmissible, though regarded in the nature of presents. The Supreme Court of the United States said in the case of Railway Co. v. Vreeland, 227 U. S. 70, 33 Sup. Ct. 196, 57 L. Ed. 417, Ann. Cas. 1914C, 176:

Where "the pecuniary loss is not dependent upon any legal liability of the injured person to the beneficiary, * * * there must, however, appear some reasonable expectation of pecuniary assistance or support of which they have been deprived."

And further said (33 Sup. Ct. 196, 227 U. S. 72, 57 L. Ed. 417, Ann. Cas. 1914C, 176): "No hard and fast rule by which pecuniary damages may in all cases be measured is possible."

We also refer to the cases of American Railway Co. v. Didricksen, 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456; Railroad v. McGinnis, 228 U. S. 175, 33 Sup. Ct. 426, 57 L. Ed. 785; Hopper v. Railroad, 155 Fed. 277, 84 C. C. A. 21; Swift & Co. v. Johnson, 138 Fed. 873, 71 C. C. A. 619, 1 L. R. A. (N. S.) 1161 (the two latter cases by Justice Van Deventer, as Circuit Judge). In the first case cited it is noted that the Supreme Court bases the federal act upon Lord Campbell's Act, which was the first of this nature ever passed. We also especially refer to the case of Dooley v. Seaboard Air Line Railway Co., 163 N. C. 454, 79 S. E. 972, for a full review, including English cases construing Lord Campbell's Act, on the question of pecuniary benefit as damages.

We think that the testimony of the contributions in the nature of labor contributed by the son upon the farm subsequent to the attainment of his majority is admissible—clearly something that could be measured in money.

With reference to other positions assumed and argued in regard to the damages, we do not think the necessities of the case require any further statement as to the rule. Anything we may say now may be academic and abstract in view of another trial. There are questions of special charges presented in this record which we will not consider, except with the general statement that it is better, wherever an affirmative presentation in a special charge is suggested by the defendant of the negative side of the issue, as to the proof of any material element in the cause when not fully covered in the main charge, the same should be given. Yellow Pine Oil Co. v. Noble, 101 Tex. 125, 105 S. W. 318.

For the error indicated, this cause is reversed and remanded for a new trial.

### On Motion for Rehearing.

Appellee asserts in a motion and argument for rehearing, of 29 pages, that we erred in reversing the case on the ground indicated in the main opinion, principally upon the contention that Heath actually or impliedly should have anticipated the death of Barnes.

[8] Heath, the freight conductor, a witness for plaintiff, testified that he first noticed the absence of Barnes from the freight caboose when they were moving out of Higgins. This record does not place Heath inside the caboose until that time, and appel-

lee says that Heath, by the electric headlight of the passenger train, after it came in, could have looked about a mile down the track where Barnes was last seen, and could have seen him on the track caught in the position indicated by Barnes' note. If Barnes was in the position, standing between the caboose and the main track, for the purpose of guarding the train, when last seen by Heath, as testified by him, why didn't the latter have a right to expect that the former was at some place upon the train when they left Higgins? And what circumstance is there in this record which could have suggested to Heath that Barnes was in danger? The uncontradicted testimony is that signals were given by the engineer for the purpose of notifying trainmen when the freight train was moved west from the water crane at Higgins, also out of Higgins. Barnes, in his purported note, says he was "jerked off way car"; at least was on the train, or had tried to get on. We have an argument of contradictory inferences, accompanying this motion, rather hard to follow. If, as appellee argues, Barnes was "drinking and throwing up and got out at the switch at Higgins, or sat on the steps of the way car in a stupor, and could not perform his duty," it is rather difficult to place Barnes within a consistent position of recovery in the manner in which the cause is alleged. It is almost a premise, if not entirely so, of contributory negligence, and in that event discovered peril only would apply.

They also argue that there were several minutes after Barnes had been jerked from the train in which he might have been discovered, during the interim between that time and the time the train left Higgins. There is not the slightest circumstance in this record that any employé of the freight train knew, or was upon inquiry, of any danger to Barnes from the time the freight train came in until it departed. We do not understand appellee to plead or impute to the railway company any drunken condition of Barnes—an emergency guardianship—creating the duty to the railway company, the violation of which by the train crew is a proximate cause producing the death of Barnes. He was jerked when "working on the rear of said train"; and plaintiff evidently pleaded that part of the case in conformity with the testimony of his witness Heath. The testimony was that this was about a 63 car train, with an engine and caboose; that when Burke, the engineer, moved the train from the water crane to the crossing on the west, it was moved usually and easily. The only contradiction as to the manner in which the train was moved was the purported note of Barnes that he was "jerked off way car." His position when "jerked," and the character of the "jerk" of course, is not stated. It may have been a troublesome situation to a jury to have resolved why a sober, experienced brakeman was jerked off a way car unless he was drunk; but, in conformity with the verdict and the way the issues were joined, we differ with appellee that they may have decided that he was drunk or in a stupor and not in the line of his duty. We cannot impute to the jury a belief that Barnes was as drunk and in the position as asserted by appellee. We impute to the jury some consistency of purpose and integrity of action, and conclude that under the court's charge, upon contributory negligence as framed they would have found that Barnes was guilty of contributory negligence. And we think there should be some consistency of argument to support a jury's verdict; at least it should not assert a premise to obtain a conclusion, when the premise of itself would destroy the recovery assuming that the verdict would have followed the court's charge. Appellant and appellees clashed on the drunken condition of Barnes, and plaintiff introduced Heath to show what Barnes was doing when last seen—"working at the rear of the train," as pleaded, not so drunk that he could not attend to his duties—and proved it from his standpoint.

[9] Appellee's further argument is that Heath, as a reasonably prudent man, should in law have anticipated the actual injury, or some like injury, to Barnes; that a concurring negligent cause with other negligent causes, producing the injury, is overlooked by us. Of course we recognize the doctrine that a concurring cause with other agencies producing the condition, or a like result if it were sufficient as one of the proximate causes of the result, or would have contributed to a similar result, necessarily should be considered legally as an element of liability. However, it must not be a remote proximate cause, though it may, in a sense, enter into the stream of results.

"Where several causes concur to produce certain results, any of them may be termed 'proximate,' *provided it appears to have been an efficient cause.*" La Batt on Master and Servant, vol. 4, § 1580.

There still exists the necessity of showing a proximate connection between the wrong and the injury.

[10] We realize that the difficulty of the rule is more in its application than in its formulation; and, of course, "an appellate court should not undertake to settle proximate cause in any case where it involves the weighing of conflicting evidence, the balancing of probabilities and the drawing of inferences." La Batt, vol. 4, § 1572.

[11] However, "when there is no reason to expect it [the injury or a like result], and no knowledge in the person doing the wrongful act that such a state of things exists as to render the damage probable, if injury results to a third person, it is generally considered that the wrongful act is not the proximate cause of the injury. * * *"

Texas & Pacific Railway Co. v. Reed, 88 Tex. 439, 31 S. W. 1058.

"* * * The question of probable cause ought to depend upon the further question whether a reasonably prudent man, in view of all the facts, would have anticipated the result, not necessarily the precise actual injury, but some like injury, produced by similar intervening agencies." Texas & Pacific Railway Co. v. Bigham, 90 Tex. 227, 38 S. W. 164.

In the Bigham Case, supra, there was a defective fastening to a stock pen gate, at which the owner of cattle was standing when his cattle, situated in the pens, ran over the gate and injured him. The negligence of the railway operatives upon a passing engine caused the cattle to scare and run over the gate. The Supreme Court further said in that cause:

"In our opinion, nothing short of prophetic ken could have anticipated the happening of the combination of events which resulted in the injury to the person of the plaintiff."

[12] The rule that conductors are expected to see that the trainmen are upon the train does not do away with the right of conductors to rely upon the presumption that trainmen will get upon the train and be at their ordinary post of duty; trainmen, we take it, also owe a duty. If trainmen are not upon the train, the conductor may have violated a duty owing to the company regulating the train service. We do not understand appellee to contend that Heath owed a duty to Barnes to see that the latter was on the train in the sense that Barnes had a reciprocal demand, flowing from such a rule, to expect of Heath to see that he (Barnes) was upon said train, and that the violation of which was pleaded and proved as a proximate cause of the death of Barnes. The violation of the rule of duty in the Bigham Case, which the railroad owed to the owner in regard to his cattle, made the injury to the cattle a proximate result; but Justice Gaines said it would have taken "prophetic ken" to have anticipated the injury to the owner standing at the gate, on account of negligently running the cattle over the gates. Of course we admit the cases are not entirely analogous; but, without attempting to discriminate, appellee would have us to require Heath to have anticipated Barnes' death as a probable result, or some like danger or situation, with reference to this rule: Go to the extent that Heath owed Barnes the duty to see that he was on the train—how could he have anticipated danger or death to Barnes as a violation of the rule? We think, to the extent at least that it would have required "prophetic ken" for Heath to have done so, this comes within the Bigham Case.

Our opinion, by mistake or typographical error, sustained the twenty-second assignment of error, when it was the twenty-first assignment intended to be sustained, which was substantially sufficient. Motion overruled.