**FONTANA et al. v. PORT ARTHUR TRACTION CO. (No. 716.)**

(Court of Civil Appeals of Texas. Beaumont. Nov. 16, 1921. Rehearing Denied Dec. 7, 1921.)

**1. Street railroads ⟨key⟩100(2)—Deaf pedestrian held negligent in omitting lookout.**

Where a deaf pedestrian using a street car track, with nothing to divert his mind from a car coming at a lawful speed of 25 miles an hour when he stepped on the track about a mile ahead of the car, which was visible to him while he walked 450 feet to the point at which he was killed by its negligent speed of 20 miles an hour, after it entered a city which had an ordinance limiting the speed to 10 miles an hour, his omission to watch for the car constituted contributory negligence, as a matter of law, precluding recovery for his death.

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**2. Street railroads ⟜117(32)—Whether deaf person was negligent in walking on track held a jury question.**

Where a deaf and dumb person used a street car track instead of the main part of the street as a walkway, when the street, which carried much traffic, was used by fast-moving motor vehicles, it was an issue of fact as to which place was the safest for him.

**3. Street railroads ⟜93(4)—Motorman's duty to pedestrian on track stated.**

It is the duty of a motorman to use reasonable diligence to prevent the car striking a pedestrian walking on the track, but no duty arises until it becomes reasonably apparent to the motorman that the person will probably not step off the track.

**4. Street railroads ⟜114(19)—Time of realizing peril may be inferred from circumstances.**

The time of realizing the peril of one struck by an approaching car may be inferred solely from circumstances.

**5. Street railroads ⟜93(4)—Motorman may assume pedestrian will avoid injury.**

A motorman has a right to presume that a person walking on the track is possessed of all his senses, knows of the approach of the car, realizes the danger of remaining on the track, and will step off at a place of safety, and it is his duty to operate his car on this presumption until he is given notice by facts and circumstances that such person is ignorant of his peril.

**6. Street railroads ⟜112(3)—Motorman's diligence presumed.**

The presumption is that the motorman on a car striking a pedestrian acted as soon as it became reasonably apparent that the pedestrian would not step off the track.

**7. Street railroads ⟜103(2)—Duty on discovering peril stated.**

The danger is discovered when the motorman has reasonable ground to believe, and it is apparent to him, that the person on the track is in danger, and he must act on the facts which would cause such a belief to an ordinary mind, but a case on such theory can only be made by affirmative evidence, direct or circumstantial, tending to show knowledge of the danger.

**8. Street railroads ⟜103(2)—Refusal to submit issue of discovered peril held proper.**

Where a street car track with slippery rails was used by a deaf pedestrian, who went on the track about a mile ahead of an approaching car, and walked about 450 feet without looking back in time to avoid injury by the car, which was traveling at a negligent speed of 20 miles an hour, without signal, and which the motorman could not stop in time, though he applied his chain brakes when he was about two carlengths away, and it was not shown how much sooner he could have stopped by reversing the motor, *held*, that it was not error to refuse to submit to the jury the issue of discovered peril.

**9. Evidence ⟜514(4)—Expert testimony held not admissible as to when motorman realized, or should have realized, that one would not step off track.**

In an action for death of plaintiff's husband, struck by a car on defendant's track, testimony of one who had operated interurban cars in another state that he realized, some two carlengths before the motorman applied the brake, that deceased was not going to get off the track, *held* inadmissible, as expert testimony is inadmissible to assist the jury in determining the time when the motorman realized the danger.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Action by Mrs. Antonia Fontana and others against the Port Arthur Traction Company. Directed verdict for the defendant, and the plaintiffs appeal. Affirmed.

Gordon, Lawhon & Pool and Sam C. Lipscomb, all of Beaumont, for appellants.

Orgain & Carroll, of Beaumont, for appellee.

WALKER, J.  B. Fontana was the husband of Mrs. A. Fontana and the father of the other appellants. On the morning of the 16th of January, 1916, while walking down the track of appellee on Seventh street, in the city of Port Arthur, he was killed by one of appellee's motorcars. This suit was instituted by appellants against appellee for damages for his death. At the conclusion of the testimony, the trial court instructed a verdict for appellee. From the record before us, we make the following conclusions of fact, raised by the evidence and reflecting the facts most favorable to appellants, to-wit:

(1) At the time of his death, B. Fontana was about 56 years old, earning from $60 to $80 per month, was in good health, and was deaf and dumb.

(2) Seventh street runs from one of the Port Arthur refineries east to the city of Port Arthur. One of the tracks of appellee is laid in Seventh street near the north side. Titsing avenue crosses Seventh street and is a boundary line of the city of Port Arthur; the city lying east of Titsing avenue. From Titsing avenue west towards the refinery, Seventh street is straight and level for more than a mile. There is no obstruction to prevent one driving a motorcar having a clear view of the track as he approaches Titsing avenue and for several blocks east of Titsing avenue.

(3) Fontana stepped onto the track of appellee about 200 feet west of Titsing avenue, walked down to the track about 450 feet to a point about 250 feet east of Titsing avenue, at which place he was struck by one of appellee's motorcars and dragged a carlength, about 50 or 60 feet.

---

⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

(4) East of Titsing avenue 500 or 600 feet, the Kansas City Southern railroad tracks cross Seventh street.

(5) At the time Fontana was killed, Seventh street was a shelled street about 60 feet wide, without sidewalks at the place where Fontana stepped on to the track east towards the Kansas City Southern crossing. The testimony does not show how far this condition extended. eastward.

(6) About 4,000 employés of the refinery used Seventh street daily in going to and from their work at the refinery; some riding bicycles, some automobiles, some street cars, and some walking. A large part of this traffic passed over this street between 5 and 8 o'clock a. m.

(7) On the south side of the street was a space reserved for a sidewalk, but was seldom, if ever, used by pedestrians. In wet weather it was sloppy and muddy, and even in dry weather it was very rough walking. Immediately north of this reserved sidewalk space was a ditch which always had water in it. From this ditch to the street car track the street was shelled. Pedestrians could have walked on the edge of the street near the ditch, but no one was ever seen walking there. North of the track was a space between the track and the north street line which might have been used by pedestrians, but from the record it does not appear that any one used that space for walking or any other purpose. An inspection of the photographs shows a ditch north of the track, and does not show that there was any walk between the ditch and the track. It does not show any walk north of the track.

The issue is raised by the record that pedestrians used no part of this street except appellee's track and the shelled portion of the street between the track and the ditch on the south side of the street. On the morning Fontana was killed there had been a light rain, enough to make the shelled portion of the street sloppy. When the street was in this condition the pedestrians habitually used appellee's track. They had been doing this for several years, in fact since the track of appellee was laid in the street.

(8) Fontana was killed about 8 o'clock on the morning of the 16th of January. He had gone to his son's store, which was immediately opposite the place where he stepped on to the track, to buy some groceries. There was no other method of reaching his son's store except by using Seventh street. A number of stores faced Seventh Street at this point. For the use of their customers, planks were laid from their doors to Seventh street.

(9) As the car approached Fontana, there were no vehicles or other obstruction on the track between the motorman and Fontana, except it appears that some short distance behind Fontana were two negroes, who stepped off the track just before the car reached them. After the negroes stepped off, there was nothing between the motorman and Fontana.

(10) As the car approached Fontana, his conduct is described by the witnesses as follows:

The witness Strickland testified:

"I was standing right next to the motorman. The next thing I observed on the track in an easterly direction towards the city of Port Arthur was this old gentlemen. When I first saw him we were better than a block away west of him. There wasn't a thing in the world to interfere with the view of that old man walking down the track, standing where I was on the street car. He was walking towards town. He didn't look back. I don't know if the motorman saw the man on the track; he was headed out that way. I saw the man a little better than a block away; he hadn't quite reached the street where he was struck. I don't remember how far east of that street he was when he was struck. I was thinking it was pretty close to that street, maybe on it, where he was struck. If anything, he was on this side of Titsing all right. He had crossed over, and it wasn't far from that street. I don't know how far, but I know it was pretty close to Titsing avenue.

"As to what the motorman did to try to stop that car, with reference to the crossing of Titsing avenue and the street car track, well, gentlemen, he done all right at the start. * * *

"I judge the motorman was about two carlengths from the man that was struck before he commenced to make an effort to stop the car, maybe not so far. It must have been less than that. It might have been two carlengths; I don't know; it has been a long time ago, but the best I remember it was about two carlengths, maybe not so far.

"When the car reached the crossing at Titsing avenue with the street car track on Seventh street, I judge he was going about 15 miles an hour then. Just before he reached Titsing I judge he was going about 20. As I said awhile ago it was about two carlengths before we got to the old gentleman that the motorman began to stop, as well as I can remember. That was before he reached the crossing. As well as I remember, he was struck right at the far side, or a little bit beyond the crossing, so that would make it probably 30 or 40 feet beyond Titsing that I noticed he made an effort to stop. His effort to stop didn't result in stopping the speed of the car much. The only thing I know as to why his efforts failed to slacken the speed of the car is that the tracks were slippery and his handbrake that he had on there, the best I can tell, locked the wheels and skidded. The car skidded until it stopped. I don't know how far that was, but it was probably three carlengths from where he began to stop. After he commenced to try to stop the car it must have skidded three carlengths; of course, I couldn't see the wheels, but it was on a slippery track, and he wound up his brake and the car just skidded along until it stopped. I should judge that the car dragged that man about a carlength after it struck him. I don't

know what the length of that car was; I suppose 50 or 60 feet. He must have been dragged the length of the car before it stopped.

"I was standing by the motorman on the front end of the car. As to whether the passengers did or said anything before the motorman did anything with reference to the speed of the car, it was so close to the time I couldn't say yes or no, because it might have been right about the time he stopped. My judgment though—and I reckon I was about one of the first to holler at that time I couldn't feel that there was anything at all done to slack that car. The passengers began to holler to the old gentleman to get off the track. I did not know he was deaf at that time and I hollered. The passengers were hollering at the motorman, 'Stop! Stop! Stop the car!' I didn't say, 'Stop the car,' but it was said. I heard it said all right. About the time I saw something was going to happen, everybody began to open up. I don't know whether that was before any effort was made by the motorman to stop the car or not. So far as I know, I never noticed the motorman make any effort to stop the car before that hollering commenced. * * *

"There was no obstruction of any kind to obstruct the view of the motorman from seeing the man on the track. The track from the refinery to town was wet."

Further examination showed that a man stood between this witness and the motorman.

The witness Hector testified:

"I can't tell you exactly my age—I have been here a long time since slavery time. I am near about 70. I have seen a man by the name of B. Fontana at Port Arthur; I knew him when I saw him.

"I was living in Port Arthur in January, 1916, and was working any work. On the morning old man B. Fontana was killed I was on the Marble Heart gallery on the front porch. With reference to you calling it the Marble Palace, I call it the Marble Heart; that is the place where I work; it is the Marble Palace, I guess. I was looking towards the track; it was early in the morning, somewhere a little past 6 or 7 o'clock; I don't remember exactly. With reference to what I saw, well, I seen the old man on the track, and the car was coming very fast; yes, sir; the car was running very fast, and I seen him walking and he was walking slow, and it got me excited, as I seen if he didn't get right off the car was going to run over him, and I tried to holler—I didn't know who he was—and there was two or three times more grass on the walk where it is now—it was awfully bad then, and there was children and folks hollering trying to make him hear, and I seen the car coming on him and I said, 'Look out! Look out! They will run over him;' and by the time I seen them strike him I got up and ran out and helped them get him out. I don't know how many miles an hour the car was making. I got no idea how fast the things come. I don't know how fast they have to go to make a mile. But I know it was going fast. With reference to the direction the man was walking that was struck by the car, why, he was going that way, towards town. He was walking on the railroad on that track. I did not see the motorman that was operating that car. I wasn't looking at him. I was looking at the man that was on there.

"Well, with reference to the car slacking up before it hit him, well, to tell you the truth, it slackened up a little bit, but it was so close when it slackened it didn't do much good, because it was coming too fast, and it was slippery and everything was wet and it was too late then. The track was wet. With reference to it being wet just at this particular place, well, they had rain the afternoon before, and that night they had a heavy fog on and it stayed wet.

"The old man was on that side—the left-hand side of Titsing avenue, and Seventh street runs this way, and another street comes across here, and he was going towards town. He had passed the crossing. According to my best recollection he was near about 200 feet from the crossing when I first saw him; it might be more or less, but near about that."

(11) No one saw Fontana when he stepped onto the track. Nor did any one testify to any facts as the car approached him, except the witnesses Strickland and Hector. The record does not show that a bell was rung or a whistle blown as the car approached Fontana. An ordinance was in force in the city of Port Arthur making it unlawful to operate a street car at a speed in excess of ten miles per hour.

(12) At the time Fontana stepped onto this track, had he looked west he could have seen this car approaching him about a mile distant, at a speed of about 25 miles an hour. The car continued at this speed until about the time it reached Titsing avenue, when the speed was reduced to about 20 miles an hour. It was traveling about 15 miles an hour when Fontana was struck.

(13) No issue of negligence is raised against the speed of the motorcar west of the point where Fontana stepped on to the track.

(14) About two carlengths before striking Fontana, the motorman applied his chain brakes. As these brakes were taking effect, and as the car began to slacken speed, the passengers on the car called to the motorman to stop and to Fontana to get off the track. This conclusion is based on the testimony of Strickland and Hector above quoted.

(15) In an effort to avoid injuring Fontana, the motorman did nothing except to apply his chain brakes. An issue of fact was made that the motorcar could have been stopped sooner by reversing the motor. How much sooner the record does not show.

(16) The motorman did not testify in the case. No one testified who saw him as the car approached Fontana. The defendant offered no testimony except a few photographs.

(17) Appellee was guilty of negligence in its manner of operating the car as it en-

tered the city of Port Arthur and at the time it struck Fontana.

[1] On appellants' proposition, we will presume that Fontana looked west as he stepped on to the street car track and saw the approaching car. Railway Co. v. Crowder, 25 Tex. Civ. App. 536, 64 S. W. 90; Railway Co. v. Wyatt, 35 Tex. Civ. App. 119, 79 S. W. 350. Unless the facts found by us exclude such presumption, it is to be further presumed that he was in the exercise of ordinary care for his own safety at the time he was killed. Lee v. Railway, 89 Tex. 588, 36 S. W. 63. This presumption can only be overcome by testimony excluding all "facts and circumstances which might have existed, the existence of which was not excluded by the testimony," on which the jury might have acquitted Fontana of contributory negligence. Railway Co. v. Price, 222 S. W. 628; Railway Co. v. Petty, 145 S. W. 1195; Railway Co. v. Fred, 185 S. W. 896; Railway Co. v. Stalcup, 167 S. W. 279. When one voluntarily places himself in a place of inherent danger, he has, as a matter of law, committed a negligent act, unless his act in so doing, in view of the attending facts and circumstances, was that of a reasonably prudent man. While the law requires one in a place of inherent danger to exercise ordinary care for his protection, it does not say that he shall do any particular thing in discharging that duty. Though stopping or looking or listening appeals to the intelligence as being a proper exercise of care in approaching a railroad crossing and walking a railroad track, the law does not say that one shall do any of these things. However, each case must rest on its own facts, and one may be placed in such a situation that such care can be exercised by him only by stopping or looking or listening. It appears to us that this appeal presents such a case.

[3] As he was deaf, Fontana could have advised himself of the near approach of the car only by using his sense of sight. This he did not do. This omission on his part must convict him of contributory negligence, as a matter of law, unless he was justified by the facts and circumstances in evidence and by the presumption arising in this case.

In discussing a case where a deaf man was killed while walking down the railroad track, Judge Gill said, in International Railway Co. v. Munn, 46 Tex. Civ. App. 276, 102 S. W. 442:

"The track was practically straight at that point, and the engine was visible to Munn, and Munn was visible to the engineer, for at least 2,000 feet. Deceased was a deaf mute, and neither saw nor heard the engine until the moment before it struck him. In failing to see the engine in time to save himself he was negligent."

On the issue of Fontana's contributory negligence, appellants advance this proposition:

"If the pedestrian's glance down the track reasonably assures him against the danger from cars approaching at lawful speed, then it is the negligence of the car driver, coming at improper speed, which approximately causes his injury, and not his negligence"

—relying on an opinion from this court in Hines v. Roan, 230 S. W. 1070. The facts are not with appellants in the proposition. No issue of negligence was made against the speed of the motorcar at the time Fontana stepped onto the track, nor are there any facts in this case making an issue of negligence against the speed of the car west of that point. So there is no basis for an assumption that Fontana regulated his speed in walking down the track by any supposed speed of the approaching car. The unlawful speed from the point where he stepped onto the track to where he was struck cannot save him from the charge of contributory negligence, because he did not know of the near approach of the car and had no facts in mind by which he could justify himself in continuing on the track. Nor can we follow appellees in their proposition that Fontana may have been preparing to step off the track when he was hit, and but for the negligent speed of the car after it entered the city would have placed himself in a place of safety. There is nothing in the record raising such an issue.

We find no facts and circumstances in this case justifying Fontana in not watching for the approaching car. He was walking in a place not used by the other street traffic. The approaching car was not obscured. This record excludes the presumption of any danger approaching him from the east. The description given of him by those who saw him walking down the track excludes the presumption that his attention was being held by something in front of him. Also the testimony excludes a presumption that the track was in such a condition as to hold his attention and direct his mind from the approaching car. We are forced to the conclusion that, as a matter of law, Fontana was guilty of contributory negligence at the time he was killed. Fontana is in no more favorable light than was Munn in Railway Co. v. Munn, supra, and there, as we have already quoted him, Judge Gill said:

"In failing to see the engine in time to save himself he was negligent."

[2] Appellee's counter proposition:

"Where it appears from the evidence that a deaf and dumb person chooses as a place to travel the track of a street railway upon which there is much traffic, and there is another way absolutely safe in its nature, although perhaps less convenient, said person will be deemed guilty of contributory negligence as a matter of law"

—though sound as an abstract statement of law, has no application to the facts of this

case. The conclusions of fact made by us exclude all walkways on this street, except the main part of the street and the track of appellee. In view of the immense amount of traffic on this street and of its use by fast-moving motor vehicles, it was clearly an issue of fact as to which was the safest walkway for Fontana.

[4-8] Nor do we think the court erred in refusing to submit to the jury the issue of discovered peril. The approach of the car placed Fontana in danger of being killed or suffering serious bodily injury. As he was thus placed in danger by appellee's motorcar, the duty rested on its servants, as soon as it became reasonably apparent to them that he could not or probably would not get off the track in time to avoid injury, to use all means at their command to avoid striking him. This duty did not arise until the peril of Fontana became reasonably apparent to the motorman, as he was the only servant of appellee who knew of his presence on the track. As there was no obstruction between the motorman and Fontana, it is presumed that the motorman saw him as the car approached and noted his conduct. San Antonio Traction Co. v. Kelleher, 48 Tex. Civ. App. 421, 107 S. W. 66.

The negligence of the motorman prior to the time he realized the danger of Fontana does not enter into the issue of discovered peril. The speed of the car before it entered the city, the slippery condition of the track, the failure to blow a whistle or ring a bell as the car approached Fontana, the failure of the motorman to realize the danger sooner, were circumstances to go to the jury on the issue of negligence of the appellee. But, if negligence, appellants' cause of action thereon was defeated by Fontana's contributory negligence, which we have already discussed. Railway Co. v. Garcia, 75 Tex. 583, 13 S. W. 223.

Appellants say:

"The time of discovering the 'perilous situation' is when the deceased was seen on the track at a point where control was still possible," citing Railway Co. v. Hodges, 102 Tex. 524, 120 S. W. 849, and Railway Co. v. Ryon, 70 Tex. 56, 7 S. W. 691.

This cannot be a sound proposition, because, if conceded, then the duty at once arises to check the speed and to control the car, so that one in danger would not be injured, even if he exercised no care for his own safety. Railway Co. v. Patella, 222 S. W. 615. It would require the operators of street cars and trains to estimate the distance between them and one on the track and regulate their speed according to the then position of the pedestrian, and destroy the presumption that one in a place of danger realizes his peril and will act in time to avoid injury. We do not construe the cases cited by appellants as announcing any such proposition. All the Supreme Court said in the Hodges Case was:

"The fireman, but not the engineer, saw the deceased at work on the track for a long distance as the engine approached him, but took no precaution until too late, assuming that deceased would get out of the way. The true question was submitted to the jury and was, Did the fireman soon enough realize the perilous situation to have prevented the catastrophe? and not what measures he ought to have taken to that end. That, if he discovered the danger, he ought to have had the engine stopped, admits of no question."

On the facts of that case, the court recognized the rule that it was the fireman's duty to have the engine stopped as soon as he discovered the danger, and not that he ought to have discovered it sooner, nor that this duty arose as soon as he saw the deceased on the track, but rested the issue on the question: "Did the fireman soon enough realize the perilous situation to have prevented the catastrophe?"

Nor is Railway Co. v. Ryon in point. There the deceased was killed while standing on the end of a cross-tie. He could have been seen 500 or 600 yards by those operating the train. The Supreme Court said:

"It [the railway company] would have been liable if it had in fact discovered Ryon on its track, and had failed to use reasonable diligence to prevent the train from running over him."

Nothing we have said conflicts with this statement of the law. It was the duty of the motorman in this case to "use reasonable diligence to prevent" the car striking Fontana, but no duty arose until it became reasonably apparent to him that Fontana would probably not step off the track.

It is not a holding of our courts that the time of realizing the peril of one struck by an approaching train must be established by direct and positive proof, but may be inferred solely from circumstances in the case. Railway Co. v. Barnes, 173 S. W. 886.

Do the circumstances in this case raise such an inference? In determining the point at which the motorman realized his peril, we must bear in mind that he had a right to presume that Fontana was possessed of all his senses, knew of the approach of the car, realized the danger of remaining on the track, and would step off in time and at a place of safety. And it was his duty to operate his car on this presumption until he was given notice, by the facts and circumstances before him, that Fontana was probably ignorant of his peril. Railway Co. v. Smith, 52 Tex. 185; Railway Co. v. Garcia, 75 Tex. 591, 13 S. W. 223. No presumption existed against the motorman that he realized Fontana's peril in time to avoid hitting him, but the presumption is that he acted as soon as it became reasonably apparent to him that Fontana would probably not step

off the track. Railway Co. v. McMillan, 100 Tex. 562, 102 S. W. 104. The fact that Fontana was walking down the track and did not look back was all the evidence to rebut this presumption and give warning to the motorman. If Fontana had known of the approach of the car, the brakes were applied to the car at a point where he had ample time to step off the track. Had a bell been rung, gong sounded, or whistle blown, and had Fontana failed to give an indication to the motorman that he heard the warning, it would have raised an issue that the motorman realized his peril. Railway Co. v. Munn, supra. But this was not done, and to hold that the motorman realized Fontana's peril and approached him without using the means at hand to warn him of his danger would be to infer a criminal intent against him. This we cannot do. As we construe the facts, the failure to give this warning was a strong circumstance in appellee's favor. We do not mean to say that the motorman could operate his car without regard to the presence of Fontana on the track until he actually knew that he would not leave the track. A most accurate statement of the motorman's duty is made by Judge Gill in the Munn Case, supra, as follows:

"The authorities, when rightly construed, are one on the proposition that, in order to give rise to this new duty resting upon the discovery of peril, it is not requisite that the engineer must know that disaster is inevitable unless he himself can avert it. It is enough if he knows that the person injured was in a place of danger from which he probably could not or would not extricate himself in time."

We believe the facts and circumstances in this case are not sufficient to raise an inference that the motorman realized the peril of Fontana in time, by the use of the means at hand, to avoid striking him.

Appellants urge that this construction of the facts is in conflict with the principles announced in Railway Co. v. Welshimer, 170 S. W. 266, and Railway Co. v. Reynolds, 103 Tex. 31, 122 S. W. 531. We do not think so. Those decisions only restate the well-recognized rule that the danger is discovered when the operatives have reasonable ground to believe, and it is apparent to them, that the person on the track is in danger, and that he must act on facts which would cause such a belief to the ordinary mind. But these decisions recognize the rule and give it full force that a case, on such a theory, can only be made by affirmative evidence, direct or circumstantial, tending to show knowledge of the danger.

But appellants insist that an issue arose on the exercise of due care by the motorman in the use of the means at hand, after he had discovered Fontana's peril. Abstractly stated, the exercise of due care in the use of the means at hand is a jury question, but

appellants have not brought sufficient facts to make an issue against the things actually done by the motorman. As Fontana was deaf, the ringing of a bell or the blowing of a whistle or the sounding of a gong would not have saved him. There was nothing for the motorman to do except to stop the car. He did this by use of the chain brake. There was testimony to the effect that the motorman could have stopped the car sooner by reversing the motor, but it was not shown how much sooner, nor were there any facts before the jury affording them a basis for estimating in what time such method would have stopped the car. After the motorman realized the perilous position of the deceased, unless reversing the motor would have stopped the car in time to avoid injuring Fontana, the failure to use that method was not a proximate cause of Fontana's death.

[9] Appellants also complain of the exclusion of the testimony of the witness Mr. Strickland to the effect that he saw Fontana as the car approached him, and realized some two carlengths before the motorman applied the brake that he was not going to get off the track, and that the motorman continued to operate the car after this witness realized his peril. This testimony was properly excluded. Strickland had operated interurban cars in California, but had never operated a street car. As to when he realized the danger was not involved in this case, and could not assist the jury in determining the time that the motorman realized it. Expert testimony was not admissible on that issue.

We believe the trial court correctly construed the facts of this case, and affirm the judgment instructing a verdict for appellee.