**TEXAS ELECTRIC RY. CO. v. WOOTEN et al.**

No. 2519.

Court of Civil Appeals of Texas. Waco.

June 10, 1943.

Rehearing Denied July 22, 1943.

464

Witt, Terrell, Lincoln, Jones & Riley, of Waco, for appellant.

Morrow & Calvert, of Hillsboro, for appellees.

RICE, Chief Justice.

This suit was brought by Mrs. Aline Wooten, individually and as next friend for her two minor daughters, against Texas Electric Railway Company for damages because of the death of her husband, W. R.

Wooten, as a result of injuries sustained by him when an interurban car of the defendant collided with his automobile at Campbell's crossing in Hill county, Texas.

The jury, in answer to special issues submitted, found the defendant guilty of primary negligence in several respects, proximately causing the collision, and also found the deceased guilty of contributory negligence in two respects, each of which they likewise found to be a proximate cause of the collision. The jury also found that the deceased was in a position of peril just prior to the collision; that the operator of the interurban car discovered his peril at a time when, by the exercise of ordinary care in the use of all the means at hand, having due regard for the safety of himself, the interurban car and its occupants, he could have avoided the collision; that the operator failed to use the means at hand and that such failure was the proximate cause of the collision. The jury further found that plaintiffs were damaged in the total sum of $18,275.

The defendant has appealed from the judgment of the District Court rendered in favor of the plaintiffs based on the findings of the jury.

Defendant takes the position that the evidence in this cause as a matter of law failed to show discovered peril, and that the findings of the jury in reference thereto are not supported by the evidence.

The accident occurred at Campbell's crossing about five miles south of Hillsboro on the main line of the interurban between Hillsboro and Waco. At this point the interurban tracks run approximately north and south, and a graveled public road, running approximately east and west, crosses the defendant's line and enters the Dallas-Waco highway approximately 50 feet west of the crossing.

From Campbell's crossing the graveled road runs east, or at right angles to defendant's tracks, for a distance of 1,589 feet, where it enters a road running approximately north and south. At the intersection last mentioned there are some farm buildings on the north side of the Campbell's crossing road for a distance of 193 feet. There are no obstructions west of these farm buildings interfering with the view of one traveling west on the graveled road approaching Campbell's crossing. From a point 2,130 feet north of the crossing to the crossing, there was nothing to ob-

struct the view of the operator of the interurban eastward along the graveled road for a distance of 1,396 feet. From said point 1,396 feet east of the crossing, the occupants of deceased's car, as it proceeded west, had an unobstructed view of defendant's line from the crossing to a point 2,130 feet north thereof. On October 1, 1941, at about 5:36 P.M., the deceased, accompanied by a Mexican man who was likewise fatally injured, was proceeding west on the graveled road when his car was struck by a southbound interurban at Campbell's crossing. The automobile was wedged under the front end of the interurban and was pushed ahead of it down the track for a distance estimated by the witnesses at from 300 to 399 feet.

The operator of the interurban testified he was running on schedule at a speed of 45 or 50 miles per hour; that at a point between 1,500 and 1,800 feet north of the crossing he blew the regular crossing whistle; and that as he proceeded toward the crossing "I was looking out both ways in front of the car." When he was approximately 600 feet north of the crossing he noticed the automobile proceeding west on the intersecting graveled road at a speed of 30 to 40 miles per hour; it was then 375 to 400 feet east of the crossing. He immediately began sounding the whistle and continued to do so until the collision occurred. When the interurban was within 300 feet, and the automobile 185 or 200 feet, of the crossing, he realized that the speed of the latter had not been diminished and applied his emergency brake. Prior to applying the emergency brake he did not slacken his speed. The automobile never did slow down from the time he first saw it. He further testified that he did not actually realize the automobile was not going to stop until it was 10 or 12 feet from the crossing; but, because it was approaching the crossing without slowing down, after he had begun whistling, he did not have any confidence in its stopping and he applied his emergency air brakes while the automobile was still approximately 200 feet from the crossing.

A witness, for the defendant, who conducted an experiment at the crossing in question, testified that at that point, with the interurban running at full speed, it was traveling 73.3 feet per second or 49.3 miles per hour, and that at this speed the emergency air brake would stop the interurban in a distance of 811 feet 2 inches; that the motor arrangement of the interurban was

such that it had to be operated at either full speed or half speed.

While it had rained shortly prior to the accident and was still misting, the witnesses testified they could see without difficulty.

Bruno Ricos testified he was standing in the cab of the interurban; he saw Wooten's car approaching and heard the whistle of the interurban blowing. He did not notice any change in the speed of the interurban, nor did he feel any jar or shock indicating that the brakes were being applied before the collision.

Ira Holder, a negro, testified for defendant that he was sitting in the door of his shack some 1,600 feet east of the crossing. The whistling of the interurban attracted his attention. He saw the automobile approaching the crossing at 25 miles per hour; the interurban's speed was 45 miles per hour. The whistling continued until the collision occurred. After the whistling began the interurban's speed was reduced but that of the automobile was not until it reached the crossing, where it appeared to the witness that it "slowed down just a little bit for the crossing, just to go over it."

Miss Barnett, a witness for defendant, was sitting on the front seat of the interurban, next to the window on the east side. The unusual blowing of the whistle attracted her attention; she looked and saw the automobile approaching the crossing; it was then closer to the road intersection than to the interurban crossing. The motorman continued to blow the whistle and ring the bell from the time she first saw the car until the collision occurred. She further testified: "Well I just noticed this car coming from the east. We were going at the usual rate of speed, I didn't notice anything unusual about the rate of speed, and I kept noticing this car coming from the east and it seemed to keep the same rate of speed all the time, and I made mention to the girl who was next to me, Miss Wilson, that it didn't look like he was intending to stop, he didn't make any attempt to slow down, and about that time I notice a little jerk in the car as if the brakes might have been applied, and we had this crash there at this Campbell crossing."

A former employee of defendant testified for plaintiff that he had been a motorman in the employ of defendant for seventeen years; that an interurban car of the type involved in the collision, when operated at full speed, could be stopped by the application of "straight air" in a distance of from 450 to 750 feet and in a shorter distance by the application of the emergency air brake; that the application of the emergency brake will cause a jerk; that the power does not cut off automatically but must be cut off by pulling the controller around by hand; that the brakes are applied with the right hand; that if the brakes are applied but the power is not cut off the car will keep moving until finally dragged down or a re-set is blown. He further testified that it sounded impossible to him that an interurban could run up on an automobile to such an extent that the car was wedged under the front end of the interurban and dragged along the cross-ties for a distance of 400 feet, if the emergency brake on the interurban had been applied at a point 300 feet before reaching the point of collision.

■ When the sufficiency of the evidence is challenged, the rule is that the evidence and all legitimate inferences therefrom must be considered in its most favorable aspect in support of the judgment, excluding all unfavorable and contradictory evidence. 3 Tex.Jur. 1090, sec. 765; Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S.W. 139; Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696; Austin v. Cochran, Tex. Com.App., 2 S.W.2d 831; Jackson v. Watson, Tex.Com.App., 10 S.W.2d 977; International-G. N. R. Co. v. Acker, Tex.Civ. App., 128 S.W.2d 506, 510, points 5 and 6.

If, from the evidence and the legitimate inferences that may be drawn therefrom, reasonable minds may differ as to whether or not the defendant's motorman actually discovered the perilous position of the injured party in time to have averted injury to him by the use of all the means at his command commensurate with safety to himself, the interurban car and the passengers thereon, and failed thereafter to use ordinary care to do so, then the issue of discovered peril would become a question of fact for the jury. Kirksey v. Southern Traction Co., supra; Trochta v. Missouri, K. & T. R. Co., Tex.Com.App., 218 S.W. 1038; Fort Worth & R. G. Ry. Co. v. Bowen, 95 Tex. 364, 67 S.W. 408; Barron v. Houston, E. & W. T. Ry. Co., Tex.Com. App., 249 S.W. 825.

■ The three essential elements of discovered peril are: (1) The exposed situation brought about by the negligence of the injured party; (2) the actual discovery by defendant's agent of the injured party's

perilous situation in time to have averted injury to him by the use of all the means at the agent's command commensurate with safety to himself, the car he is operating and the passengers thereon; and (3) the failure thereafter to use such means. Turner v. Texas Co., 138 Tex. 380, 159 S.W.2d 112; Northern Texas Traction Co. v. Singer, Tex.Civ.App., 34 S.W.2d 920; Texas Electric Service Co. v. Kinkead, Tex.Civ.App., 84 S.W.2d 567; Northern Texas Traction Co. v. Weed, Tex.Com.App., 300 S.W. 41.

■ It has been held that the vital and controlling issue in every case involving the application of the doctrine of discovered peril is whether the perilous position of the injured party is discovered in time to avoid the injury by the use of all the means at hand. Northern Texas Traction Co. v. Weed, supra, and cases there cited at page 44 of 300 S.W.

In this case it is admitted that defendant's motorman discovered the perilous position of deceased; therefore the vital issue involved was as to the time of such discovery, that is, whether such peril was discovered in time to have avoided the collision by the use of all the means at the motorman's command.

■ The time of the realization of the peril of one struck by an approaching train may be inferred solely from circumstances in the case. Southern Kansas R. Co. v. Barnes, Tex.Civ.App., 173 S.W. 880, 886; Fontana v. Port Arthur Traction Co., 235 S.W. 1098, 1103; International & G. N. Ry. Co. v. Munn, 46 Tex.Civ.App. 276, 102 S. W. 444; International & G. N. R. Co. v. Tinon, Tex.Civ.App., 117 S.W. 936.

■ Applying the applicable rules of law to the facts of this case, we have reached the conclusion that the evidence was sufficient to authorize the submission of the issue of discovered peril to the jury for its determination.

■ It was in evidence that defendant's motorman began blowing the whistle as soon as he saw the automobile, and continued to blow it continuously thereafter. It is admitted that the automobile's speed was never slowed. There were no circumstances in the record from which an inference could be reasonably drawn that the occupants of the automobile were ever aware of the approaching interurban. The jury could have inferred from the foregoing that the motorman knew and realized that the occupants of the automobile were un-

aware of their danger, and that unless he immediately applied his brakes a collision would ensue. While the motorman testified that he first saw the automobile when the interurban was 600 feet north of the crossing, the jury was not bound to accept his evidence and could have concluded that he saw it and began using his whistle at a point much farther north because he testified that he had maintained a lookout from the time that his car was within 1,500 to 1,800 feet of the crossing. Miss Barnett testified that her attention was first attracted by the unusual blowing of the whistle; that she looked and saw the approaching automobile; that it kept approaching at the same rate of speed, made no attempt to slow down and she made mention to her companion that it did not look like the driver of the automobile intended to stop; that about this time she noticed a little jerk as if the brakes might have been applied and then came the crash. The motorman testified that when he was 300 feet north of the crossing he noticed the deceased "didn't slow his speed down any, he just kept coming"; and he thereupon applied his emergency brakes. The jury was not bound to accept this witness' estimate of the distance he was from the crossing when he realized that in spite of the warning whistle, the automobile continued to approach the crossing at the same rate of speed or his further statement that he applied his emergency brake at this time. Bruno Ricos testified that he did not notice any change in the speed of the interurban and did not feel any jerk indicating that the brakes had been applied. When his oral deposition was taken and also on his direct and cross examination on this trial the motorman was given an opportunity to tell all that he did in trying to avert the collision; he did not state that he shut off the power until on re-direct examination his attention was directed thereto by defendant's counsel. The interurban traveled a distance of 400 feet from the point of the collision, dragging the automobile, wedged under it, along the cross-ties. Defendant's expert testified that the interurban could have been stopped at a distance of 811 feet and 2 inches by the application of the emergency brake alone. The witness Wright testified that in his opinion it was impossible, if the brakes had been applied 300 feet north of the crossing, that the interurban could have traveled an additional 400 feet south of the crossing, dragging the

automobile. He further testified that the interurban, when operated at full speed, could be stopped by the application of "straight air" within a distance of from 450 to 750 feet, and within a shorter distance by the application of the emergency air brake. When it was struck, approximately half of the automobile was in the path of the interurban. The motorman testified that when he first saw the automobile the interurban was 600 feet from the crossing and the automobile was 375 feet therefrom. If the interurban was traveling at full speed, it was moving at the rate of 72.3 feet per second, and, if the brakes were not applied, would reach the crossing in almost exactly 8.3 seconds. If the automobile was traveling at 30 miles per hour, or 44 feet per second, it would have reached the crossing in slightly less than 8½ seconds. In other words, if neither the operator of the interurban nor of the car applied their brakes or decreased their power, the interurban and the automobile would have reached (as they did) the crossing at almost the same instant. Miss Barnett testified that when she first saw the automobile approaching from the east, it was nearer the road intersection than it was to the interurban crossing. It is undisputed that the road intersection referred to was 1,596 feet east of the interurban crossing. Her testimony therefore places the automobile at a point at least 800 feet east of the fatal crossing, when her attention was first attracted by the unusual blowing of the interurban's whistle. It is undisputed that the speed of the interurban as it approached the crossing was greater than that of the automobile. If Miss Barnett's estimate as to the distance between the automobile and the interurban crossing, at the time her attention was first attracted, were accepted, the jury could have inferred that the interurban was more than 800 feet north of the crossing when the unusual whistling began and not 600 feet as testified by the motorman. The jury could have taken the foregoing facts into consideration and have reached the conclusion that the motorman did not shut off the power and did not apply his brakes at all; or that he did not apply them when he first realized that the occupants of the car were unaware of the approaching interurban and therefore were in a perilous position. We are further of the opinion that the jury was warranted in concluding from the facts above stated that

the motorman saw the perilous position of deceased in time to have averted injury to him had he used all of the means at his command.

We next consider appellant's assignment that a new trial should have been granted because of the misconduct of the jury.

█ It is undisputed that the jurors English and Wilkes, during the progress of the trial, and after the defendant's witness Holder had testified, went down to the scene of the accident, observed the crossing in question, traveled over the graveled road that deceased's car was on at the time of the accident, observed the country generally, and stopped at the cabin of the witness Holder. The juror English undertook to place himself as nearly as he could in the position that Holder had testified he was in at the time he saw the accident, and thereupon looked around at the track and crossing and then stated to juror Wilkes that the negro Holder could not have seen as far north as he had testified he could. Juror Beatty testified that one of the jurors reported the incident and said "he couldn't see very far up the track." Juror Griffin testified that the only thing he remembered that was said was "they just didn't see how the negro could have seen the crossing and him sitting in the door." Juror Eubanks testified that the two jurors said they passed and saw the house and the road and it was open country. Juror English admitted going to the negro's cabin; sitting down in the door to observe the crossing and the track; that he concluded the negro could not see as far north as he had testified he could; and that he so told the jury. All the happenings above detailed took place before the jury reached a verdict. Each of the jurors placed upon the witness stand during the hearing on the motion for new trial testified that none of these occurrences influenced his verdict. It will be remembered that the witness Holder had testified that while sitting in the door of his shack his attention was attracted by the whistling of the interurban. On looking up he saw the interurban approaching Campbell's crossing at a speed of 45 miles per hour, and that the whistle was blown and the bell was rung continuously from then on until the collision took place; that after his attention was first attracted he noticed that the speed of the interurban was slackened. The question of whether or not the motorman applied the brakes at all prior to the collision was a sharply controverted issue; there was evi-

dence pro and con. The statement of the juror to his fellows, after he had made the experiment above detailed, that he did not believe the negro could see as far north as he had testified he could; nor (as one juror testified) that "they just didn't see how the negro could have seen this crossing and him sitting in the door," was calculated to bring the entire testimony of the negro into disrepute. The fact that jurors, during the trial, visited the scene of the accident, has been held to be reversible error. Norris Bros., Inc., v. Mattinson, Tex.Civ.App., 118 S.W.2d 460; Republic Insurance Co. v. Hale, 128 Tex. 616, 99 S.W.2d 909; Texas Midland Railroad v. Brown, Tex.Com.App., 228 S.W. 915. If the misconduct influenced the verdict of one of the jurors, the verdict should be set aside. Moore v. Ivey, Tex.Com.App., 277 S.W. 106.

It has also been held that the testimony of jurors to the effect that the matters of misconduct did not influence their verdict "is utterly without force or effect." Sproles Motor Freight Lines, Inc., v. Long, Tex., 168 S.W.2d 642, 644.

In our opinion, it reasonably appears from the evidence adduced on the motion for new trial, and from a careful consideration of the entire record, that the misconduct of the jurors hereinabove detailed probably resulted in injury to the defendant. Because thereof a new trial should have been granted. Rule 327, Vernon's Texas Rules of Civil Procedure. Under the foregoing rule, where misconduct of the jury is established, the question of whether injury probably resulted therefrom to the complaining party is a question of law for the reviewing court. Barrington v. Duncan, Tex., 169 S.W.2d 462.

It further appears from the testimony, adduced on the motion for new trial, that during their deliberations the jury misunderstood the instructions of the court to the effect that the jury, in determining the damage suffered by the minor plaintiffs, might take into consideration the counsel of the father to such children, some of the jurors thinking that the word "counsel" had reference to attorney's fees. One of the jurors stated that he imagined the attorneys would get one-third; another mentioned an attorney's fee of fifty per cent. Of the jurors who testified, all save two stated that when the court's charge was re-read and explained that they realized the word "counsel" as used in the court's charge did not

mean attorney's fees but the advice of a father to his children, and that they did not consider the question of attorney's fees in deciding the amount of plaintiffs' damages. The juror Griffin first voted for total damages in the sum of $15,000. While his testimony is somewhat conflicting, he testified that in rendering his verdict he took into consideration the fact that the plaintiffs would have to pay attorney's fees and expenses. On cross-examination he testified that in answering the issues on damages he only considered the evidence in the case; in answer to a subsequent question he stated: "Well, I think we considered the attorney's fees." He further testified that he believed the question as to attorney's fees influenced him in arriving at his verdict. Juror Eubanks testified that he arrived at his opinion of the amount of damages by multiplying the deceased's expectancy by fifty dollars per month; that the jury reached the conclusion that the word "counsel", as used in the court's charge, had nothing to do with attorney's fees; that he did not know how Mrs. Wooten would pay her attorneys. The question was then asked: "Did you take that into consideration in fixing the amount?" He answered: "Yes, I figured she might have to pay it out of that." He further stated that he did not award any more money by way of damages because of attorney's fees.

In a damage suit for personal injuries it is improper for any of the jurors to mention or discuss the fact that the injured claimant may have to pay his attorney out of his recovery. Texas Electric Co. v. Swafford, Tex.Civ.App., 159 S.W.2d 938, and cases there cited.

Under a proper application of Rule 327, Texas Rules of Civil Procedure, it may be questionable that the misconduct of the jury in discussing attorney's fees, standing alone, would constitute reversible error. However, if such misconduct is considered in connection with the misconduct of the jury first above set forth, then the rule applied by our Supreme Court in the case of Sproles Motor Freight Lines v. Long, 168 S.W.2d 642, 644, may be applicable: "It has been held by this court that where the record shows a number of instances of improper argument, no one instance being sufficient to call for a reversal, yet all the instances taken together may do so. Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302. Misconduct of

470

the jury ought to be governed by the same rule."

In connection with the proper application of the foregoing rule it might be pertinent to say that the record presents errors assigned to arguments made by plaintiffs' counsel. In view of our disposition of this case and because the errors complained of will likely not occur again, we feel that it is unnecessary to discuss them.

For the reasons above set forth, the judgment of the district court is reversed, and the cause is remanded for a new trial.